**TAXPAYERS FOR SENSIBLE PRIORITIES, Mary Ellen Bluntzer, M.D., Campbell Read, Joe Wells, Syd Reagan, David Gray, D.J. Young, Betty Thompson, Nancy Bateman, Roy Williams, and James Lynch, Appellants,**

v.

**CITY OF DALLAS, Appellee.**

**No. 05–01–01579–CV.**

Court of Appeals of Texas, Dallas.

June 6, 2002.

James B. Blackburn, Blackburn Carter P.C., Houston, for Appellants.

Orrin L. Harrison, III, Eric T. Stahl, Vinson & Elkins, L.L.P., Dallas, for Appellee.

Leroy L. Denooyer, Asst. City Atty., Dallas, for Appellee.

Before Justices JAMES, O'NEILL, and FRANCIS.

## OPINION

Opinion By Justice FRANCIS.

This appeal involves the issuance and expenditure of $246 million in general obligation bonds approved by City of Dallas ("City") voters to develop the Trinity River Corridor Project. Taxpayers for Sensible Priorities and ten citizens challenge the trial court's summary judgment in the City's favor, arguing fact issues exist on whether the City has breached its contract with voters by making various changes to the project.

We must decide whether (1) the contract is the bond proposition itself or whether the contract also includes extraneous documents printed and distributed by City staff but not approved by the City Council, (2) the City has shown, as a matter of law, that it has not breached the contract, and (3) appellants may now challenge the validity of the 1998 bond election.

For the reasons set out below, we conclude the bond proposition itself is the contract between voters and the City, and extraneous documents not approved by the City Council do not form any part of that contract. Further, we conclude the City has established, as a matter of law, that it has not breached the contract. Finally, we conclude appellants' challenge to the bond election is time-barred. Accordingly, we affirm the trial court's summary judgment.

In February 1998, the Dallas City Council passed an ordinance calling for a special election for voters to decide eleven different bond proposals. One of these proposals, Proposition 11, dealt with the Trinity River Corridor Project and is the subject of this dispute. Proposition 11 asked voters:

Shall the city council of the city of Dallas, Texas, be authorized to issue general obligation bonds of the city in the aggregate principal amount of $246,000,000 for the purpose of providing funds for permanent public improvements, to wit: developing, constructing, and acquiring the Trinity River Corridor Project, including floodway extension and flood reduction and control improvements, levees and related street and road improvements, including the City's share of the costs of the Trinity Parkway, lakes, waterways, open space and recreational facilities, and other facilities, improvements and equipment necessary and incidental thereto; said bonds to mature serially over a period not to exceed twenty (20) years from their date, to be issued in such installments and sold at any price or prices and to bear interest at any rate or rates as shall be determined within the discretion of the city council under laws in effect at the time of issuance, and to provide for the payment of the principal of and interest on said bonds by levying a tax sufficient to pay the annual interest on and to create a sinking fund sufficient to redeem said bonds as they become due?

Consistent with Proposition 11, the language on the ballot asked voters to approve:

THE ISSUANCE OF $246,000,000 GENERAL OBLIGATION TRINITY RIVER CORRIDOR PROJECT BONDS, THE PROJECT TO INCLUDE FLOODWAYS, LEVEES, WATERWAYS, OPEN SPACE, RECREATIONAL FACILITIES, THE TRINITY PARKWAY AND RELATED STREET IMPROVEMENTS, AND OTHER RELATED, NECESSARY, AND INCIDENTAL IMPROVEMENTS TO THE TRINITY RIVER CORRIDOR.

The City Council did not pass any other ordinance or resolution describing the project. However, City staff developed, print-

ed, and distributed a pamphlet entitled "1998 Capital Bond Program Summary In–Brief." The pamphlet bore the official City seal, contained the names of the Dallas City Council members and the district each represented, and summarized each of the eleven separate bond propositions. With respect to Proposition 11, the pamphlet described the Trinity River Corridor Project as the City's share of "interdependent projects, to be implemented over 10 years, that will leverage over one billion dollars in state, federal, and other agency funds." The pamphlet broke down the project into five anticipated components and allocated amounts to each component: (1) Dallas Floodway Extension, $24.7 million; (2) Elm Fork Levee, $30 million; (3) Transportation Improvements, $118 million; (4) Great Trinity Forest, $41.8 million; and (5) Chain of Lakes, $31.5 million. The pamphlet further provided fairly detailed descriptions of each of the categories.

In addition to the pamphlet, City staff also distributed two other documents at community meetings held before the bond election: a single-paged document entitled "Year in Review Update March 1998" ("March Update") and a two-paged document entitled "Trinity River Corridor Projects" ("Corridor Projects"). Both documents, like the pamphlet, bore the official City seal and allocated amounts for various components of the project. These documents, however, did not provide the more detailed descriptions of the components offered by the pamphlet.

On May 2, 1998, a majority of voters passed Bond Proposition 11. Later that year and again in 1999, the City sold a total of $46 million of the bonds into the public securities markets and began initial work on the project. In December 2000, appellants filed their original petition and application for permanent injunction against the City, alleging the City had unlawfully changed the project from the way it was represented to voters in the pamphlet. In particular, they complained the size, cost, and length of time of the project "changed radically" because it was going to cost more than $500 million and be built in two phases, instead of one. Additionally, appellants made specific complaints about changes to four of the five components set out in the pamphlet: Elm Fork Levee, Chain of Lakes, Great Trinity Forest, and transportation improvements. Appellants sought an injunction (1) requiring the City to "accomplish the project components and to do so for the amounts the voters approved," and (2) prohibiting the City from spending the money in a "manner different from the design approved by the voters."

In response, the City filed an original petition for expedited declaratory judgment under chapter 1205 of the Texas Government Code ("Expedited Declaratory Judgment Act"). The City sought a judgment declaring, among other things, that it (1) is authorized to issue the Proposed Trinity River Bonds in installments and, once issued according to proper procedure, the bonds are lawful and valid obligations and contracts of the City, (2) is authorized to expend the bond funds "for any purposes stated and described" in the bond proposition, and (3) can change or amend the ordinances authorizing the bonds "as may be necessary or appropriate." The City also sought to permanently enjoin any proceeding contesting the validity of the Proposed Trinity River Bonds. The trial court consolidated the two lawsuits.

Thereafter, the City filed a motion for summary judgment to confirm the "legality and validity" of the Trinity River Corridor Project bonds. In its motion, the City asserted two basic propositions: (1) its

contract with voters is the bond proposition, not the pamphlet or "any other representation made by City staff or individual officials," and (2) it had been "absolutely faithful" to the bond proposition. Additionally, the City contended appellants' "election contest" is time-barred. Various affidavits and other documentary evidence supported the motion.

In their response to the motion, appellants contended the pamphlet and other documents form part of the contract with voters. They contended material fact issues exist as to whether the changes implemented by the City constitute a breach of contract. Also, appellants argued that, although Texas law allows changes to be made if the contract is not "arbitrarily ignored and repudiated," the City presented no evidence "that conditions have materially changed" since the bonds were voted. Finally, they argued the City's lawsuit brought into issue the legality and validity of the bonds and they were therefore entitled to litigate their complaint that the bond proposition was improperly "multifarious," despite time limitations on such complaints set out in the Texas Election Code. As with the City, various affidavits and documents supported appellants' response.

The trial court ultimately ruled in the City's favor. The judgment declared, among other things, that (1) Bond Proposition 11 constitutes a valid contract with the voters and the external publications "do not impose binding obligations" on the City; (2) the previously issued 1998 and 1999 Trinity River Bonds are legal and valid obligations, and the City's prior expenditure of funds from these bonds is lawful, valid, and authorized by law; (3) the City is authorized to issue the remaining $200 million in bonds, and when issued and executed in accordance with law, the bonds constitute lawful and valid obli-

gations and contracts of the City. This appeal ensued.

This Court reviews a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Foreness v. Hexamer*, 971 S.W.2d 525, 527 (Tex.App.-Dallas 1997, pet. denied). When reviewing a traditional summary judgment, we apply well-known standards. *See* Tex.R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex.1993); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 23 (Tex.1990); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Orozco v. Dallas Morning News, Inc.*, 975 S.W.2d 392, 394 (Tex.App.-Dallas 1998, no pet.). The party moving for summary judgment has the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972).

In their first issue, appellants complain the trial court erred in granting summary judgment to the City because fact issues exist as to the breach of Proposition 11. Appellants acknowledge Proposition 11 is a contract with voters; however, they contend that representations beyond the language of the proposition are part of the contract. In particular, they argue representations made in three publications—the pamphlet, March Update, and Corridor Projects—bind the City as to how to develop the project. This Court has held contrary to appellants in a case factually indistinguishable from the present case.

In *Davis v. Duncanville Independent School District*, 701 S.W.2d 15 (Tex.App.-Dallas 1985, writ dism'd w.o.j.), taxpayers sought to prevent the school district from building a natatorium with bond money approved by voters in an election. Prior to the election, the school superintendent represented in several community meet-

ings that bonds were needed to finance construction of new facilities because of anticipated growth in the district. *Davis*, 701 S.W.2d at 17. The superintendent also represented that if the school population did not grow as expected, the bonds would not be sold. *Id.* A leaflet containing growth figures was distributed at these meetings and placed in residents' mail slots. The leaflet specifically projected the need for four elementary schools and one junior or senior high school. The leaflet bore the names of the school board members, and some board members helped to distribute it. *Id.* The anticipated growth did not materialize, yet the board decided to use a portion of the bond funds to build a natatorium. The taxpayers sued, arguing the district was bound by the representations made by the superintendent and contained in the leaflet and could not use the money otherwise. *Id.*

This Court rejected the taxpayers' contention, reasoning that a political subdivision of the State may act only as a body corporate at a properly called meeting. *Id.* In *Davis*, none of the representations at issue were formally adopted by the board as a body at a called meeting. The fact that the board was aware of the leaflets and of the superintendent's presentations was of no moment:

> Consent or acquiescence of, or agreements by, the individual members acting separately and not as a body do not bind the board of the political subdivision which they represent, and all persons are chargeable with knowledge that such is the case.

*Id.* (citing *Webster v. Tex. & Pac. Motor Transp. Co.*, 140 Tex. 131, 166 S.W.2d 75, 77 (1942)).

■ In this case, the City supported its motion with the affidavit of City Secretary Shirley Acy. Acy swore that "[n]o other ordinance or resolution was passed by the City Council authorizing or approving any representation to the voters of the City of Dallas regarding the May 2, 1998 bond election." In particular, Acy asserted the City Council did not authorize the publication or distribution of the pamphlet, and "there is no ordinance or resolution approving any other representations to the public regarding the Trinity River Corridor project, other than the Bond Proposition itself." This evidence conclusively established that the City made no representations regarding Bond Proposition 11 other than the proposition itself. We therefore conclude, as we did in *Davis*, that the City is not bound by any representations made in the pamphlet or other document relied on by appellants.

■ In reaching this conclusion, we reaffirm the importance of the basic legal principle set out in *Davis:* a political subdivision cannot be bound by the representations of individual council members or the City staff. While we are not unsympathetic to appellants' argument that the documents at issue here appear to be City-sanctioned, the legal principle involved is not an arbitrary rule. Rather, its purpose is to afford each member of a governing body the opportunity to be present and to impart to his colleagues the benefit of his experience, counsel, and judgment on an issue so that when it is decided, it is the "composite judgment of the body as a whole." *See Webster*, 166 S.W.2d at 77. Carving out an exception that would allow City staff (or even individual council members) to bind the City on details of a complex, multimillion-dollar project, without a formal vote of those elected to protect our citizens' interests, is simply unworkable and contrary to the City Charter. As stated in *Webster:*

> Were the rule otherwise, it might often happen that the very one whose

judgment should and would carry the most weight, either by reason of his greater knowledge and experience concerning the special matter, by his riper wisdom and better judgment, or by his greater familiarity with the wishes and necessities of those specially to be affected, or from any other reason, and who was both able and willing to attend, is through lack of notice an absentee. All the benefit, in short, which can flow from the mutual consultation, the experience and knowledge, the wisdom and judgment of each and all members, is endangered by any other rule.

*Id.* (quoting *Paola & Fall River Ry. Co. v. Anderson County Comm'rs,* 16 Kan. 302, 309 (1876)).

■ Finally, we decline any invitation to ignore this Court's own precedent in favor of an attorney general's letter opinion that, according to appellants, recognizes "that a representation which is not 'official' can still bind a government regarding a bond election." Initially, we note the letter opinion relies on the same case as did the dissent in *Davis* for its conclusion that representations, outside of official orders or resolutions, "may give rise to a contract with the voters." Tex. Att'y Gen. LO–92–71 (1992). A panel majority of *Davis* implicitly rejected the reasoning of that case, *Devorsky v. La Vega Independent School District,* 635 S.W.2d 904 (Tex.App.-Waco 1982, no writ). Moreover, even in the absence of *Davis,* we would not be bound by an attorney general's opinion. *See City of Garland v. Dallas Morning News,* 969 S.W.2d 548, 554 (Tex.App.-Dallas 1998) (recognizing that, although attorney general's opinions are entitled to due consideration, they are not binding on courts), *aff'd,* 22 S.W.3d 351 (2000).

Having concluded the extraneous documents are not part of the contract with voters, we turn to appellants' next argu-ment: even if this Court determines that the contract with voters is defined only by the language of Proposition 11, the City has breached the contract. While they cite law regarding ambiguity in a contract, appellants make no argument that Proposition 11 is ambiguous, nor could they do so successfully. Rather, they argue specific terms within the proposition—"Trinity River Corridor Project" and "Trinity Parkway"—have specific meanings, which appellants propose defining through the use of extraneous documents. Those documents, they argue, show that voters approved a one-phase, $246 million project with "specific dollar allocations to different improvements." With respect to Trinity Parkway, they argue voters approved a 45 mph parkway with ingress into and egress out of the park system, yet plans now call for a 55 mph, limited access turnpike.

■ It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted. *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975, 978 (1936). It is also elementary that in instances where the law visits upon a governing body the duty to exercise its sound judgment and discretion, courts have no right to interfere so long as such body acts lawfully. *Id.* In other words, the City has the right to exercise its sound discretion in expending bond proceeds for purposes for which they were sold. *Id.*

Contrary to appellants' argument otherwise, Proposition 11 is broadly phrased to provide the City Council with discretion in deciding how to implement the details of a complex and lengthy project. In particular, Proposition 11 authorizes funds to develop, construct, and acquire the "Trinity River Corridor Project." The Trinity River Corridor Project includes:

(1) floodway extension and flood reduction and control improvements;

(2) levees and related street and road improvements, including the City's share of the costs of the Trinity Parkway;

(3) lakes, waterways, open space, and recreational facilities; and

(4) other facilities, improvements, and equipment necessary and incidental thereto.

Nothing in this wording allocates specific dollar amounts to specific improvements. Nor is there anything in the wording of the proposition that precludes the City from *ever* spending more than $246 million on the Trinity River project or seeking private funds or going into a second phase. It simply requires that the $246 million approved by voters be spent on the above types of improvements in the Trinity River corridor. With respect to the Trinity Parkway, it clearly is a "street and road improvement." There is nothing in the language of the proposition that defines the specific number of lanes, speed limit, or configuration. Rather, specific parameters are not included, most likely so that the City would have the needed discretion to define the specific roadway as all the component parts come together.

While appellants acknowledge the general contract principle that "[t]he primary concern of a court in construing a contract is to ascertain the true intent of the parties as expressed in the instrument," they urge this Court to go outside the contract to glean the circumstances existing at the time the contract was entered. But appellants are not trying to resolve the "meaning" of the proposition; they are simply proposing to add terms to the measure not there at the time voters approved it. This we will not do.

Having rejected appellants' arguments that we look outside the language of the bond proposition to determine its meaning, we now turn to the evidence produced by the City to establish that it has not breach-ed its contract. To establish its plans for the Trinity River Corridor Project, the City produced the affidavit of Rebecca Dugger. Dugger, director of the project, testified that she prepared a "work plan" for the project. The plan was continuously updated. Dugger's affidavit outlined extensive details on plans for the project. Thus far, the City has approved bond proceeds to be spent (1) to purchase property for the Great Trinity Forest and Dallas Floodway Extension, (2) on an environmental impact statement on the Trinity Parkway, (3) on a "floodplain management study" for the Elm Fork area, and (4) on developing a Master Implementation Plan to develop lakes and recreational amenities throughout the Trinity River Corridor.

■ Each of these approved expenditures relates to the project and its provisions for flood control, transportation improvements, lakes, and recreational amenities, all components specifically referenced in the proposition. Appellants do not argue otherwise; rather, their brief relies on purported changes from representations made in the extraneous documents. Because we have concluded those representations are not binding on the City, any change from those documents cannot be the basis for any breach. Consequently, we conclude the evidence establishes the City has not breached its contract with voters and no material fact issue exists. We resolve the first issue against appellants.

Appellants' second issue is premised on a conclusion that the City breached the contract. Because of our holding otherwise, we need not address issue two. *See* TEX.R.APP. P. 47.1.

In their third issue, appellants contend summary judgment was not proper on their affirmative defense of illegality or their counterclaim alleging the bond prop-

osition was impermissibly multifarious. In their first amended answer and counterclaim, appellants raised illegality in their answer and asserted the City's "claims are barred by illegal actions of [the City] in breaching its contract with the voters." We have previously concluded the City established that it had not breached its contract with voters and no material facts are in dispute. In doing so, we necessarily disposed of appellants' "affirmative defense" of illegality.

■ Appellants also allege an affirmative claim that Proposition 11 impermissibly "combined more than one separate and distinct proposition into a single question," which essentially is a belated challenge to the May 2, 1998 election. Chapter 233 of the Texas Election Code governs contests of an election on a measure. TEX. ELEC. CODE ANN. § 233.001 (Vernon 1986). A "measure" means "a question or proposal submitted in an election for an expression of the voters' will." TEX. ELEC.CODE ANN. § 1.005(12) (Vernon Supp.2002). A "proposition" means the "wording appearing on a ballot to identify a measure." Id. at § 1.005(15). Except for circumstances not presented here, one contesting an election must file the petition not later than the thirtieth day after the date the official result of the contested election is determined. See id. at § 233.006(b) (Vernon Supp.2002). Thus, under the election code, appellants had to file their contest within thirty days of the official election results.

Nevertheless, appellants urge that because the City sought and received a judgment declaring "that the Proposed Trinity River Bonds, including the Proposed Series 2001 Bonds are and will be in all respects legal and valid," their contest is not subject to the general statutory time constraint. They rely on Ex parte Progreso Independent School District, 650 S.W.2d 158 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.), for support. We are not persuaded.

In Progreso, school district taxpayers sought to enjoin the issuance of school bonds, and the district brought a declaratory judgment action as did the City here. The Corpus Christi Court of Appeals recognized the limitation set out in the election code, but then concluded the trial court could properly consider the validity of the election pursuant to the declaratory judgment action because the District put the matter "in issue":

> The District's petition alleged that the election was duly held and requested the court to declare that 'all proceedings taken in connection with the authorization and issuance of the proposed bonds ... be validated and confirmed....'

Progreso, 650 S.W.2d at 161.

■ We need not decide whether the ultimate holding in Progreso is correct because, in this case, the City did not seek any declaration regarding the validity of the election nor did the trial judge make any such declaration. In essence, whether the City breached its contract with voters by making changes to a bond project approved by voters is a much different issue than whether the bond proposition on its face illegally combined more than one issue.

Here, the City's lawsuit centered on the validity of the bonds in light of appellants' contentions that the City had breached its contract with voters. The City sought declarations that: (1) it was authorized to issue the bonds in installments, including the Proposed Series 2001 Bonds; (2) the bonds were lawful and valid obligations and contracts of the City; (3) the City was authorized to expend the unexpended proceeds of previously issued bonds; and (4) the City could, in the future, make changes

and amendments to the ordinances authorizing the Proposed Trinity River Bonds, as long as the changes are approved by the Texas Attorney General. None of these declarations go to appellants' charge that Proposition 11 is impermissibly multifarious; thus, we cannot say that the City put the validity of the election at issue. We resolve the third issue against appellants.

We affirm the trial court's judgment.