Opinion issued August 31, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00792-CV

———————————

Daphne Scarbrough, Appellant

V.

The
Metropolitan Transit Authority of Harris County, Appellee



 



 

On Appeal from the 215th District Court

Harris County, Texas



Trial Court Case No. 0731651

 



 

O P I N I O N

          Appellant,
Daphne Scarbrough, argues that the trial court erred in granting the plea to
the jurisdiction of appellee, the Metropolitan Transit Authority of Harris
County (METRO).  In seven issues, she
argues that: (1) the trial court erred in finding that she had no standing to
sue because METRO’s “Contract With the Voters” provides standing to
property-tax payers and referendum voters; (2) the trial court erred in finding
that she had no standing because even petition-signers, who have significantly
less at stake, have previously been found to have standing to sue METRO over
its “Main Street” Line; (3) the trial court erred in finding she had no
standing because it improperly focused on how she voted rather than on whether
she voted; (4) the trial court erred in finding she had no standing by
misinterpreting the requisites for taxpayer standing in a way that would make it
impossible for anyone to sue METRO; (5) the trial court erred by refusing to
abate its hearing on METRO’s plea to the jurisdiction until after the fact
finder resolved disputed fact issues; (6) alternatively, if the trial court was
correct in granting METRO’s plea to the jurisdiction, it erred in ruling that
Scarbrough take nothing and should have dismissed her case without prejudice;
and (7) alternatively, the trial court erred by refusing to provide Scarbrough
an opportunity to replead prior to dismissal of her case.

          We
modify the judgment and affirm as modified.

Background

          In
the late 1990s, METRO began to develop a plan known as METRO Solutions, which
was intended to increase transit options in the METRO service area by adding
new rail and bus lines and by making contributions to street improvements.  On August 28, 2003, METRO’s board of
directors approved resolution number 2003-93, providing notice of a special
election 

for the purpose of
submitting to the qualified electors of the Metropolitan Transit Authority of
Harris County, Texas . . . a proposition to authorize METRO to issue bonds,
notes and other obligations payable, in whole or in part, from seventy-five
percent (75%) of METRO’s sales and use tax revenues for the acquisition,
construction, repair, equipping, improvement or extension of METRO’s transit
authority system, including the METRO Solutions transit system plan, as
described herein, which includes bus service expansions and construction of
extensions of METRO’s rail system known as “METRORail,” to approve such plan
and construction of the METRORail and commuter line components thereof, and to
dedicate twenty-five percent (25%) of METRO’s sales and use tax revenues
through September 20, 2014, for street improvements and mobility projects, as
authorized by law and with no increases in the current rate of METRO’s sales
and use tax; and making other provisions related to the subject.

 

Metropolitan Transit Authority of Harris County,
Resolution 2003-93 (Aug. 28, 2003) (“Resolution 2003-93”).  

          METRO
attached a copy of its resolution number 2003-77 (“Resolution 2003-77”),
calling the special election, as an exhibit to its notice of special
election.  This resolution stated, in
part, 

Section 14.  METRO Agreements with the Voters.  As authorized by Section 451.072 of the METRO
Act and other applicable law, the Board hereby declares that, if a majority of
the voters voting at the Election approve the Proposition, the following
agreements will be binding on METRO and will constitute contracts with the
voters in accordance with their terms and may not be repealed, altered or
rescinded by any succeeding Board without voter approval at a subsequent
election:

(a)  The aggregate principal amount of bonds, notes or other obligations of
METRO that are payable, in whole or in part, from
seventy-five percent (75%) of METRO’s sales and use tax revenues and are issued pursuant to the authority granted at
this Election will never exceed $640,000,000;

(b) Proceeds of the bonds, notes or other obligations authorized at the
Election will be used to acquire, construct, repair, equip, improve or extend
METRO’s transit authority system, including the METRO Solutions Plan, provided
that the only portions of METRORail for which such proceeds may be used are new
segments included in Phase II of METRORail, as more particularly described in
Exhibit A-4;

(c)  Approval of the Proposition at the Election constitutes approval of the
METRO Solutions Plan, including the extensions and
segments of METRORail and the construction of the METRORail and Commuter Line
Components thereof for purposes of the city charter of the City of Houston;

(d) METRO will not undertake the construction of any new segment of Phase II
of METRORail with proceeds of the bonds, notes or other obligations authorized
at the Election without first obtaining approval of the segment for federal
capital assistance under applicable federal law and regulations or the
commitment of a substantial amount of private funds;

(e)  METRO’s Street Improvement
Dedication will be in force and effect through September 30, 2014, in
accordance with the terms of such dedication, as described in Exhibit B;

(f)   Between November 1, 2009 and
January 1, 2013, METRO will call an election seeking a local determination by
voters regarding METRO’s continuing support after September 30, 2014 for
improvements of the types described in Section 451.065 of the METRO Act;

(g)  Prior to November 1, 2009, METRO will not call any other election seeking
voter approval to authorize METRO to issue bonds, notes or other obligations to
provide any rail facilities other than Commuter Line Component, as more
particularly described in Exhibit A-8 and depicted in Exhibit A-9, which are
hereby made a part of this Resolution; and

(h) METRO will not implement any
increase in the rate of its currently existing, previously voted one percent
(1%) sales and use tax.

 

(Emphasis added.)

Exhibit A-4, referenced in Section
14, paragraph (b) of Resolution 2003-77, provided the details of METRORail
Phase II.  In pertinent part, it stated:

METRORail Phase II generally consists of the following
light rail segments or lines, including associated vehicles and facilities:

 

. . . .

 

Westpark

·       
Approximately 6.6 miles
westward from the Wheeler station on Phase I METRORail to the Hillcroft Transit
Center, serving Greenway Plaza, West University, Bellaire and the
Uptown/Galleria area.  This segment or line will have
approximately 4 stations.

 

. . . .

 

Note: Final
scope, length of rail segments or lines and other details, together with implementation
schedule, will be based upon demand and completion of the project development
process, including community input. 
The METRO Solutions Bus Component Park & Ride in the vicinity of
Hobby Airport will be deferred until a later phase of the Southeast segment or
line.

 

(Emphasis added.)

Finally, Exhibits A-8 and A-9,
referenced in Section 14, paragraph (g) of METRO Resolution 2003-77, described
the Commuter Line Components.  Exhibit
A-8 described the commuter line components, stating that they “generally
consist” of “rail segments or lines, including associated vehicles and
facilities,” along US 90A, US 290, and “other commuter rail corridors within
the METRO service area as are found to be feasible.”  This exhibit also contained the caveat that the
“[f]inal scope, length of rail segments or lines and other details, together
with implementation schedule, will be based upon demand and completion of the
project development process, including community input.”  Exhibit A-9 was a “Transit System Plan” mapping
the various lines discussed in Exhibit A-8.

          The
special election occurred on November 4, 2003, and voters approved the METRO
Solutions Plan.  

According to the affidavit of
METRO’s executive vice president, METRO’s board of directors decided in 2007 to
pursue light rail as the preferred transit mode for several of the lines
discussed in the METRO Solutions Plan due to several factors, such as changes
in the profitability of particular bus routes and in the availability of
federal funding.  This affected the
Westpark segment of light rail lines connecting the Wheeler Station and the
Hillcroft Transit Center authorized in the 2003 referendum.  According to Scarbrough’s pleadings, METRO
currently plans to place a portion of that line in the center of the street on
Richmond Avenue, where it will pass by Scarbrough’s property.  

On May 23, 2007, Scarbrough filed this
suit against METRO as a voter who opposed the METRO Solutions transit system
plan in the 2003 referendum and as a residential property owner, commercial
businesswoman and taxpayer in the City of Houston and Harris County, asserting
claims for breach of contract, declaratory judgment, and unconstitutional
impairment of contract and alleging that METRO was improperly implementing the
terms of the November 2003 referendum election. 


          Scarbrough
contends that Resolution 2003-93, with its exhibits, including Resolution
2003-77 authorizing the referendum and its exhibits, constitutes a “clear and
unambiguous contract” between METRO and the voters and taxpayers and that METRO
has failed to comply with the Resolution. 
She states that Metro has entered into a contract calling for early
construction activities, whereas Resolution 2003-77 provides that METRO may not
undertake the construction of any new segment of Phase II of METRORail with
proceeds of the obligations authorized at the Election “without first obtaining
approval of the segment for federal capital assistance.”  She further states that cost estimates for
the project exceed the $640 million authorized by the Resolution.  Finally, she contends that “Section 14 of the
Resolution specifies that the agreements contained in subparagraphs (a)-(h) may
not be ‘repealed, altered or rescinded’ without voter approval at a subsequent
election,” that “Section 14(c) makes clear that approval of the Resolution
includes approval of the entire Metro Solutions Plan,” that METRO is “not
complying with the routes specified in the Resolution,” and that the voters
“did not authorize Metro to use any portion of Richmond Avenue for the portion
of METRORail known as the Westpark route.” 
Thus, she contends that the use of funds authorized by Resolution
2003-93 to construct any of the METRORail project on Richmond is illegal.

          Scarbrough
alleges that she has standing as a voter and taxpayer of property taxes and of
METRO’s use and sales tax because she will suffer significant financial damages
“if METRO is allowed to proceed in violation of the Resolution.”  She further contends that, because her
property and business on Richmond run along one of the streets METRO is
proposing to use for the Westpark route, her use and enjoyment of the property
will be harmed by the line and that the construction, operation, and
maintenance of the line will affect her property rights and severely disrupt
her business.

          METRO
filed a plea to the jurisdiction, arguing that Scarbrough could not assert
standing as a voter, taxpayer, or property owner and that she lacked standing
to litigate any issue related to bus service or to challenge METRO’s
distribution of “General Mobility Funds.” 
METRO also argued that several of Scarbrough’s issues were not ripe,
were moot, or did not constitute justiciable controversies.  Scarbrough amended her pleadings to include
additional facts in support of the trial court’s jurisdiction over the case,
and she specifically argued that “[t]he case at bar demonstrates a legal and
factual pattern where the merits are inextricably intertwined with certain
jurisdictional facts,” and thus a fact finder was required to resolve fact
questions regarding the jurisdictional issue. 
Scarbrough also filed a separate motion asking the trial court to abate
its hearing on METRO’s plea to the jurisdiction until after a fact finder could
address the “intertwined” facts pertaining to jurisdiction and the underlying
merits.

          The
trial court denied Scarbrough’s motion to abate and subsequently held a hearing
on METRO’s plea.  On August 21, 2008, the
trial court issued its “Order Granting METRO’s Plea to the Jurisdiction and
Dismissing Case,” which stated,

The Court concludes that it
does not have subject matter jurisdiction over Scarbrough[’s] legal claims—for all
of the reasons set forth in Metro’s legal briefing.  Therefore, the Court hereby grants Metro’s
plea to the jurisdiction.  The Court
orders that Scarbrough takes nothing because she has no standing to pursue the
claims asserted.  This is a final order,
disposing of all issues and all parties.

 

This appeal followed.

Standing

In her first four issues,
Scarbrough argues that the trial court erred in finding that she did not have
standing to bring her claims.

A.      Standing Generally

          Standing
is implicit in the concept of subject-matter jurisdiction, and subject-matter
jurisdiction is essential to the authority of a court to decide a case.  Tex.
Ass’n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443 (Tex.
1993).  Thus, standing is never presumed,
cannot be waived, and can be raised for the first time on appeal.  Id.
at 443–45.  We review standing under the
same standard by which we review subject-matter jurisdiction generally.  Id. at
446.  Whether the trial court has
subject-matter jurisdiction is a question of law that we review de novo.  Tex. Dep’t of Parks & Wildlife v.
Miranda, 133 S.W.3d
217, 226 (Tex. 2004).

A plea to the jurisdiction is a
dilatory plea, which is intended to defeat a cause of action regardless of
whether the claims asserted have merit.  Bland Indep. Sch. Dist. v. Blue, 34
S.W.3d 547, 554 (Tex. 2000).  The pleader
must allege facts that affirmatively demonstrate the trial court’s jurisdiction
to hear the case.  Tex. Ass’n of Bus., 852 S.W.2d at 446.  If a plea to the jurisdiction challenges the
existence of jurisdictional facts, as here, we consider relevant evidence
submitted by the parties when necessary to resolve the jurisdictional issues
raised.  See Bland, 34 S.W.3d at 555. 
We take as true all evidence favorable to the nonmovant and indulge
every reasonable inference and resolve any doubts in the nonmovant’s
favor.  Miranda, 133 S.W.3d at 228. 
If the relevant evidence is undisputed or fails to raise a fact question
on the jurisdictional issue, the trial court rules on the plea to the
jurisdiction as a matter of law.  Id.

          Generally, unless standing
is conferred by statute, a plaintiff must demonstrate that he “possesses an
interest in a conflict distinct from that of the general public, such that the
defendant’s actions have caused the plaintiff some particular injury.”  Williams
v. Lara, 52 S.W.3d 171, 178 (Tex. 2001); see also Tex. Ass’n of Bus., 852
S.W.2d at 446 (“The general test for standing in Texas requires that there (a)
shall be a real controversy between the parties, which (b) will be actually
determined by the judicial declaration sought.”) (internal quotation omitted).

B.      Voter Standing 

          In
her first issue, Scarbrough argues that she has standing as a voter and
taxpayer to challenge METRO’s planned use of bond and tax funds because
representations made in exhibits attached to the notice of special election on
the bond referendum created a “contract with the voters.” In her second issue,
Scarbrough argues that she has standing as a voter because even
petition-signers, who have less interest at stake than she does as a voter,
have standing.  In her third issue,
Scarbrough argues that how she voted is immaterial and that the fact that she
voted, “without more, is sufficient to trigger standing to complain over
METRO’s inability or outright refusal to comply with contractual terms of the
2003 Referendum.”  We first address
Scarbrough’s claim that she has standing as a voter to challenge the proposed
application of bond funds.

With respect to Scarbrough’s third argument,
that she has standing as a voter in the 2003 referendum, without more, to
challenge the proposed application of bond funds, we note that the Texas
Supreme Court has pointed out that “[n]o Texas court has ever recognized that a
plaintiff’s status as a voter, without more, confers standing to challenge the
lawfulness of governmental acts.  Our
decisions have always required a plaintiff to allege some injury distinct from
that sustained by the public at large.”  Brown v. Todd, 53 S.W.3d 297, 302 (Tex.
2001).  This limitation is informed by
the two constitutional limitations on subject-matter jurisdiction—the separation of powers doctrine and Texas’s
open courts provision—which both
require “an actual, not merely a hypothetical or generalized grievance.”  Id.  Additionally, the Texas Supreme Court “has
never recognized standing on the basis of the results—as opposed to the process—of an initiative election.”  Id.

In Brown, a plaintiff asserted “that he possess[ed] an injury distinct
from the general public because he voted in [the referendum at issue], his vote
was for the prevailing side, and Mayor Brown’s executive order negated his
vote.”  Id.  The court held, 

[T]his proposed rationale
for standing is too broad because the injury he identifies is not unique to
him.  Indeed, it is shared by all living
Houstonians who were among the 198,563 electors who actually voted against the
proposed ordinance.  In no way does [the
plaintiff’s] status as a voter give him an interest sufficiently peculiar to
satisfy our standing requirements.

 

Id.  Similarly, Scarbrough’s status as a
voter, without more, does not confer standing because she is challenging the
results of the election, not the process by which it was conducted and she has
not asserted an injury unique to her that is not shared by every other
Houstonian who voted in the November 2003 referendum.

Scarbrough also argues, however,
that she has standing as a voter under City
of Houston v. Todd.  41 S.W.3d 289,
302 n.21 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).  In Todd, Robb Todd, a city counsel member, and Allan Vogel, a voter
who had signed a petition for a referendum on the city ordinance granting METRO
the right to construct a light rail line along Main Street, sued the City of
Houston and METRO when the City refused to hold an election on the referendum.  Id. at
292–93.  The petition, which Vogel signed
but Todd did not, stated that a vote of the citizens of Houston was required by
the city charter before METRO could construct the Main Street light rail line.  Id.
at 293.  

This Court ruled against Vogel and
the other plaintiff on the basis of the City’s argument that the city charter
provisions relied upon by the plaintiffs were preempted by provisions of the
Texas Transportation Code and were not applicable to the complained-of
ordinance.  Id. at 295, 302.  The Court
did not address the issue of standing, except to state, “We note that appellee
Vogel has standing. . . .”  Id. at 302 n.21.  The opinion cited Blum v. Lanier, which held that a qualified voter who spearheaded
and signed an initiative petition had standing to challenge the form in which the
referendum was put to the citizens.  See 997 S.W.2d 259, 262 (Tex. 1999).  Scarbrough does not challenge the form in
which Resolution 2003-93 was put to the voters. 
Thus, she has not shown that Todd
is relevant to this case.  See id. at 295–302.  Rather, the applicable rule is that stated in
Brown, in which the supreme court
held that a plaintiff’s status as a voter, without more, does not confer
standing to challenge the lawfulness of governmental acts, that the plaintiff
must allege some injury distinct from that sustained by the public at large,
and that the court “has never recognized standing on the basis of the results—as opposed to the process—of an initiative election.” Brown, 53 S.W.3d at 302.

Finally, Scarbrough contends that
she has standing as a referendum voter and taxpayer to challenge METRO’s
alleged violations of section 14 of Resolution 2003-77, attached as an exhibit
to Resolution 2003-93, the resolution approved by the voters in the 2003
referendum.  She argues that the Texas
Supreme Court has held that the terms of resolutions and orders calling a tax
or bond election to approve financial undertakings of a governmental body
become a contract with the voters. 
Scarbrough cites several cases regarding “contracts with the voters” in
her argument asserting that she has standing. 
See San Saba County v. McCraw,
108 S.W.2d 200, 202–03 (Tex. 1937); Fletcher
v. Howard, 39 S.W.2d 32, 34 (Tex. 1931); Black v. Strength, 246 S.W. 79, 80 (Tex. 1922); Moore v. Coffman, 200 S.W. 374, 374–75
(Tex. 1918); Taxpayers for Sensible
Priorities v. City of Dallas, 79 S.W.3d 670, 676 (Tex. App.—Dallas 2002,
pet. denied).  However, one of these, San Saba County, did not involve a suit
of a citizen voter against a governmental entity; rather, it was a suit by a
county attempting to compel the attorney general to approve the funding of
certain road and bridge bonds.  See San Saba County, 108 S.W.2d at
201.  The remaining cases all address
suits by voters who were also property taxpayers to require a governmental
entity to use the bond funds for the purpose for which they were approved.  See
Fletcher, 39 S.W.2d at 32–33; Black,
246 S.W. at 80; Moore, 200 S.W. at
374–75; see also Taxpayers for Sensible
Priorities, 79 S.W.3d at 675–76.  Thus, we
conclude that these cases are more properly characterized as taxpayer suits.  See
Bland, 34 S.W.3d at 555 (characterizing as taxpayer challenge action by
taxpayers seeking permanent injunction against payments by school district under
lease-purchase agreement for new high school that they claimed violated the
Public Property Finance Act, Tex.
Local Gov’t Code § 271.004,
providing for voter approval of contracts for purchase or improvement of real
property by school districts). 
Therefore, we address these cases in the next section.

We hold that Scarbrough’s status as
a voter in the November 2003 bond referendum, without more, does not confer
standing on her to sue METRO for its alleged misuse of bond funds whose
issuance was authorized by the referendum.[1]

We overrule Scarbrough’s first,
second, and third issues insofar as they allege her standing as a voter in the
November 2003 referendum.

 

C.      Taxpayer Standing

          In
her first and fourth issues, Scarbrough argues that she has standing to sue on
METRO’s alleged “contract with the voters” as a voter and taxpayer.  Scarbrough contends that METRO’s expenditure
of public taxpayer funds on its current light rail plans would be illegal
because those plans were not authorized by the 2003 resolution and referendum.

The Texas Supreme Court addressed
taxpayer standing to sue a public entity for the alleged misappropriation of
public funds in Bland.  34 S.W.3d at 549.  The supreme court recognized the rule that, 

[i]n general, taxpayers do
not have a right to bring suit to contest government decision-making because,
as we observed more than half a century ago in Osborne v. Keith, “[g]overnments cannot operate if every citizen
who concludes that a public official has abused his discretion is granted the
right to come into court and bring such official’s public acts under judicial
review.”

 

Id.  However, while recognizing that “taxpayers
must show as a rule that they have suffered a particularized injury distinct
from that suffered by the general public in order to have standing to challenge
a government action or assert a public right,” the court also recognized the
“long-established exception to this rule,” under which “a taxpayer has standing
to sue in equity to enjoin the illegal expenditure of public funds, even
without showing a distinct injury.”  Id. at 555–56.  The court recognized that the exception,
“strictly limited, provides important protection to the public from the illegal
expenditure of public funds without hampering too severely the workings of the
government.”  Id. at 556–57 (refusing to apply taxpayer exception where contract
sought to be enjoined had already been performed and suit was, therefore, moot,
and concluding that potential for disruption of government operations was too
great to allow taxpayer with no special injury distinct from general public to
sue to prohibit government for paying for goods and services already received).

          Here,
Resolution 2003-93 provided notice of a special election “for the purpose of
submitting to the qualified electors of the Metropolitan Transit Authority of
Harris County, Texas . . . a proposition to authorize METRO to issue bonds,
notes and other obligations payable, in whole or in part, from seventy-five
percent (75%) of METRO’s sales and use tax revenues for the acquisition,
construction, repair, equipping, improvement or extension of METRO’s transit
authority system, including the METRO Solutions transit system plan, as
described herein.”  It is undisputed that
METRO’s sole tax support comes from a one percent sales tax, and it is likewise
undisputed that Scarbrough, a voter in the 2003 referendum on Resolution
2003-93, pays both this sales tax and property tax.  Scarbrough argues, therefore, that her
payment of this sales tax and her status as a landowning property-tax payer
confer standing on her as a taxpayer to challenge METRO’s current plan for rail
on Richmond as an illegal expenditure of public funds under the exception to
the general taxpayer standing rule.

METRO argues that Scarbrough does
not have taxpayer standing because the Texas Transportation Code restricts
METRO from imposing ad valorem property
taxes, and thus the only tax Scarbrough pays to METRO is the one percent sales
tax, which the Texas Supreme Court has unequivocally held is insufficient to
confer standing.  Scarbrough argues that
applying this rule to conclude that she lacks standing to sue METRO would make
it impossible for anyone to sue METRO.  

To support her claims that she has
standing as a sales tax and property tax payer to challenge METRO’s alleged
improper diversion of funds from the proceeds of obligations authorized to be
issued by the 2003 Referendum, Scarbrough relies on Williams v. Lara, in which the Texas Supreme Court considered
taxpayer standing to oppose the expenditure of public funds to support the
Chaplain’s Education Unit (CEU) within the Tarrant County Corrections Center
(TCCC).  52 S.W.3d at 175.  One of the plaintiffs paid only sales tax;
the other paid sales and property tax. 
The supreme court held that taxpayers may fall under the limited taxpayer
exception to the general rule that a plaintiff must demonstrate that he
possesses an interest in a conflict distinct from that of the general
public.  Id. at 179 (citing Bland,
34 S.W.3d at 556).  “Taxpayers in Texas
have standing to enjoin the illegal expenditure of public funds, and need not
demonstrate a particularized injury.”  Id.  This
limited exception to the general rule requires that the plaintiff be a taxpayer
and that public funds be expended on the allegedly illegal activity.  Id.  The court further held that whether the
plaintiff has taxpayer standing depends upon the type of tax she claims to have
paid.  Id.

In Williams, the supreme court expressly held that “paying sales tax
does not confer taxpayer standing upon a party.”  Id. at
180.  In reaching this conclusion, the
court reasoned:

Taxpayer standing is a
judicially created exception to the general standing rule.  We have already limited the applicability of
this exception by narrowly defining the type of action a taxpayer can
maintain.  A taxpayer may maintain an
action solely to challenge proposed illegal expenditures; a taxpayer may not
sue to recover funds previously expended, or challenge expenditures that are
merely “unwise or indiscreet.” 
Underpinning these limitations is the realization that “[g]overnments
cannot operate if every citizen who concludes that a public official has abused
his discretion is granted the right to come into court and bring such
official’s public acts under judicial review.” 
Extending taxpayer standing to those who pay only sales tax would mean
that even a person who makes incidental purchases while temporarily in the
state could maintain an action.  This
would eviscerate any limitation on taxpayer suits.  It would allow a person with virtually no
personal stake in how the public funds are expended to come into court and
bring the government’s actions under judicial review.  This is not what this Court envisioned in
crafting the taxpayer-standing exception.

 

Id. (internal
citations omitted).  Although the court
held that the plaintiff who paid only sales tax lacked standing, it also held
that the plaintiff who paid property taxes did satisfy the taxpayer
requirement, and it stated that “[t]he dispositive issue regarding [his]
standing is whether Tarrant County is actually expending public funds in
operating the [allegedly unconstitutional entity, the CEU].”  Id. at
180–81.  

Because it was dealing with a case
of first impression, the supreme court in Williams
looked to federal cases dealing with the issue of “what constitutes expending
public funds.”  Id. at 181.  The court stated
that it would “look to the jurisprudence of municipal taxpayer standing to
guide [it] in determining whether” the county was expending public funds in
operating the CEU.  Id.  It cited multiple
federal cases supporting the proposition that “[m]unicipal taxpayers need only
establish that they pay taxes to the relevant entity, and that public funds are
expended on the allegedly unconstitutional activity.”  Id.  It further stated that to be entitled to
taxpayer standing a plaintiff “must prove that the government is actually
expending money on the activity that the taxpayer challenges” and that “merely
demonstrating that tax dollars are spent on something related to the allegedly
illegal conduct is not enough.”  Id. 
The court went on to state that the record in Williams established that the county was using tax dollars to
manage the allegedly unconstitutional CEU because county-paid employees
oversaw, managed, and “spent a significant amount of the County’s time
operating” the unit.  Id. at 182–83.  Implicit in this reasoning is
the fact that the property tax paid by the plaintiff was paid to the county,
the entity that was supporting the allegedly illegal activity.

Concerning Scarbrough’s standing as
a taxpayer, we note that while the supreme court prohibited extension of
standing to challenge the expenditure of public funds to someone who paid only
sales tax, Scarbrough does not fall into this category.  The fact that she also pays property tax
addresses the concern raised in Williams that
“[e]xtending taxpayer standing to those who pay only sales tax would mean that
even a person who makes incidental purchases while temporarily in the state
could maintain an action.”  Id. at 180.  However, this distinction is insufficient to
overcome the bright-line rule in Williams
that standing to challenge the expenditure of public funds as illegal cannot be
derived from the payment of sales tax due to policy concerns.  Thus, we must look to Scarbrough’s standing
as a property-tax payer.

The relationship between
Scarbrough’s payment of property taxes here and the anticipated allegedly
illegal expenditures by METRO is much more attenuated than the relationship
between the expenditure of tax funds and the allegedly unconstitutional
expenditure of those funds in Williams.  In Williams,
the plaintiff paid property taxes directly to the entity, Tarrant County, which
supported the allegedly illegal CEU activity in the TCCC.  See id.
at 181 (“To be entitled to municipal taxpayer standing, a litigant must
prove that the government is actually expending money on the activity that the
taxpayer challenges; merely demonstrating that tax dollars are spent on
something related to the allegedly illegal conduct is not enough.”); see also Bland, 34 S.W.3d at 556
(explaining that exception allowing taxpayer standing to sue to enjoin
expenditure of illegal funds is justified because “[w]hen a taxpayer brings an
action to restrain the illegal expenditure . . . of tax money, he sues for
himself, and it is held that his interest in the subject-matter is sufficient
to support the action”) (quoting Hoffman
v. Davis, 100 S.W.2d 95, 96 (Tex. 1937)). 


By contrast, in approving
Resolution 2003-93, about which Scarbrough complains, the voters authorized the
funding of the METRO transit system plan as described in the resolution by the
issuance of bonds, notes and other obligations payable from METRO’s sales and
use tax revenue, as well as by “federal capital assistance under applicable
federal law and regulations or the commitment of a substantial amount of
private funds.”  See Resolution 2003-93 (proving notice of special referendum
election and including as exhibit Resolution 2003-77, ¶¶ (a), (d), calling
special election).  The referendum did
not authorize METRO to use any property taxes to fund the implementation of the
authorized transit plan.  Thus,
Scarbrough cannot argue that any of her property taxes are being used to fund
the complained-of activity.  

          The
“contract with voters” cases cited by Scarbrough similarly fail to accord her
standing.  Each of these cases
acknowledged the standing of property-tax payers obligated to pay through their
taxes for bonds issued for public construction projects pursuant to voter
approval in a bond election.  Fletcher, 39 S.W.2d at 34; Black, 246 S.W. at 80; Moore, 200 S.W. at 374–75; Taxpayers for Sensible Priorities, 79
S.W.3d at 676.  Each of these cases
involved a suit brought by property taxpayers who had voted to issue bonds to
be paid for from general tax revenues, including from their property taxes.  See
Fletcher, 39 S.W.2d at 32–33 (treating pre-election orders as contract
between commissioners’ court and “electorate entitled to vote at said election”
and overturning dismissal of voter and property-tax payer suit alleging
diversion of proceeds from sale of bonds issued for use on certain public
road); Black, 246 S.W. at 80 (holding
that county commissioners’ court that had adopted order designating roads to be
improved if bond issue carried could not designate other roads to be improved
with proceeds of bonds after election contrary to “the will of those having to
bear the bond burden”); Moore, 200
S.W. at 374–75 (in action by property owners subject to tax for bond issued
pursuant to county bond election, affirming injunction against diversion of
proceeds of bond sales to construction of bridge at different location than
presented in petition for bond election); see
also Taxpayers for Sensible Priorities, 79 S.W.3d at 675–76 (holding, following sale of general obligation
bonds approved by city voters to develop waterway project and initiation of
work on project, “It is elementary that the proceeds of bonds voted by the
people must be expended for the purposes for which they were voted.”).  Scarbrough does not have standing under the
foregoing cases through her payment of property taxes because in each of those
cases the bonds authorized burdened property tax payers, whereas the bonds and
other obligations authorized to be issued by voter approval of Resolution
2003-93 are payable only from METRO’s sales and use tax revenues.

We decline to extend the very
limited taxpayer exception to the general taxpayer standing rule based on the
attenuated relationship between Scarbrough’s tax payments and the funding of
METRO’s transit plan authorized by Resolution 2003-93.

We overrule Scarbrough’s fourth
issue.

D.      Standing as an Affected Property Owner

          Scarbrough
also impliedly contends that she does have a “personal stake in whether METRO
complies with the Resolution” because METRO intends to construct a portion of
the METRORail “right in front of her home and business.”  Her petition alleges concerns over the
disruption caused by the construction and other alleged dangers and
inconveniences.  However, Scarbrough
concedes that “it is true that [she] is not alleging or currently able to prove
that METRO has taken her property” and that “a takings claim is not yet ripe.”

          Both
ripeness and standing are components of subject-matter jurisdiction.  McAllen
Med. Ctr., Inc. v. Cortez, 66 S.W.3d 227, 232, 234 (Tex. 2001).  Standing prohibits suits by those who are not
personally aggrieved.  DaimlerChrysler Corp. v. Inman, 252
S.W.3d 299, 304 (Tex. 2008).  The
ripeness doctrine prohibits suits involving “uncertain or contingent future
events that may not occur as anticipated, or indeed may not occur at all.”  Perry
v. Del Rio, 66 S.W.3d 239, 250 (Tex. 2001). 
An issue is ripe for decision when at the time a lawsuit is filed the
facts are sufficiently developed “so that an injury has occurred or is likely
to occur, rather than being contingent or remote.”  Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 851–52 (Tex. 2000).

There was no evidence at the time
the trial court ruled that METRO’s proposed construction would occur on any
part of Scarbrough’s property or that she would be denied access to or
restricted in the use of her property, nor do Scarbrough’s pleadings assert
such claims.  Rather, she concedes that as
of the time of the trial court’s ruling, any claims she might have related to
her use or enjoyment of her property or to a taking by METRO were not ripe for
adjudication.  Thus, Scarbrough
acknowledges and we agree that the likelihood of injury to her depended on
factors too speculative to address at the time of the trial court’s ruling and that
any such claims were, therefore, not ripe for decision.  See
Perry, 66 S.W.3d at 250; Gibson,
22 S.W.3d at 851–52.

          We
conclude that Scarbrough’s claims based on her status as a property owner were
not ripe at the time of the trial court’s ruling, and thus this ground did not confer
subject-matter jurisdiction on the trial court.

 

 

E.      Standing Hearing & Opportunity to
Replead

          In
her fifth issue, Scarbrough argues that the trial court erred by refusing to
abate its hearing on standing until after a trial on the merits.  However, standing is implicit in the trial
court’s subject-matter jurisdiction to consider a case.  Tex.
Ass’n of Bus., 852 S.W.2d at 443.  Thus,
the trial court correctly considered the jurisdictional challenge raised by
METRO before proceeding to a trial on the merits of Scarbrough’s claims.  See id.

          Scarbrough argues, however, that “[t]he
case at bar demonstrates a legal and factual pattern where the merits are
inextricably intertwined with certain jurisdictional facts.”  Specifically, she argues that a jury trial
was necessary to determine standing because the question of standing was
intertwined with the merits of whether the resolution in question authorized
METRO to construct a light rail line along Richmond Avenue.  She argues, “This is precisely the type of
situation that the Texas Supreme Court had in mind when it decided the Miranda case: ‘[i]f the evidence creates
a fact question regarding the jurisdictional issue, then the trial court cannot
grant the plea to the jurisdiction, and the fact issue will be resolved by the
fact finder.’”  See Miranda, 133 S.W.3d at 227–28. 
We disagree.

          The alleged contract with the voters
upon which Scarbrough bases her claims consists of Resolution 2003-93, i.e.,
the bond proposition itself, together with its exhibits, which the 2003
referendum approved, not extraneous documents. 
See Taxpayers for Sensible
Priorities, 79 S.W.3d at 676 (holding that extraneous documents were not
part of contract with voters created by voter approval of bond proposition).  Thus, the ripe issues raised in Scarbrough’s petition
are questions of law regarding the construction of the terms of the Resolution,
not questions of fact regarding the details of the Resolution’s implementation.  The facts material to a determination of
Scarbrough’s standing as to her ripe claims are complete, are jurisdictional,
and are largely uncontested.  No
additional discovery is necessary to determine Scarbrough’s standing to assert
her ripe claims, hence to decide the plea to the jurisdiction.  See Bland, 34 S.W.3d at 555 (holding that we consider relevant evidence submitted
by parties when necessary to resolve jurisdictional issues raised); Miranda, 133 S.W.3d at 227–28 (holding
that if relevant evidence is undisputed
or fails to raise fact question on jurisdictional issue trial court rules on
plea to jurisdiction as matter of law).

          We
overrule Scarbrough’s fifth issue.

In her seventh issue, Scarbrough
argues that even if the trial court correctly determined that she lacked
standing to bring her claim, it erred in refusing to allow her to replead.  

If a plaintiff fails to plead
sufficient facts affirmatively demonstrating the trial court’s jurisdiction,
but the pleadings do not affirmatively demonstrate incurable defects in
jurisdiction, he should be afforded the opportunity to amend.  County
of Cameron v. Brown, 80 S.W.3d 549, 555 (Tex. 2002).

Here, the challenge to jurisdiction
was not made based on Scarbrough’s pleadings, but on the jurisdictional facts
presented in the trial court.  Because
the jurisdictional facts upon which we rely were largely uncontested and
because Scarbrough has otherwise failed to indicate that there is any genuine
fact issue to be resolved, and thus her lack of standing cannot be changed by
merely repleading her case, we need not remand. 
See Miranda, 133 S.W.3d at
226–28 (“If the pleadings affirmatively negate the existence of jurisdiction,
then a plea to the jurisdiction may be granted without allowing the plaintiff
an opportunity to amend . . . .  [I]f the
relevant evidence is undisputed or fails to raise a fact question on the
jurisdictional issue, the trial court rules on the plea to the jurisdiction as
a matter of law.”).

          We
overrule Scarbrough’s seventh issue.

Terms of Judgment

In her sixth issue, Scarbrough
argues that, even if the trial court correctly determined that she lacked
standing to bring her claims, it erred in issuing a take-nothing judgment
against her, rather than dismissing her claims without prejudice.  Scarbrough is correct that the trial court’s
lack of jurisdiction prevented it from entering a judgment on the merits.  See Tex.
Ass’n of Bus., 852 S.W.2d at 443 (holding that standing is implicit in
trial court’s subject matter jurisdiction to consider case).  However, the trial court’s order here does
not enter a judgment on the merits.  Its
order was titled “Order Granting METRO’s Plea to the Jurisdiction and
Dismissing Case.”  However, it stated,
“The Court orders that Scarbrough takes nothing because she has no standing to
pursue the claims asserted.”  Thus, we
modify the trial court’s order to make it clear that Scarbrough’s claims are
dismissed for lack of jurisdiction and that the trial court’s judgment was not
an adjudication on the merits of any claim she may have over which she is able
to establish subject-matter jurisdiction.[2]

          We
sustain Scarbrough’s sixth issue.




 

Conclusion

          We
modify the trial court’s judgment dismissing Scarbrough’s claims to clearly
reflect that her case was dismissed for lack of jurisdiction and affirm it as
modified.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

 

 











[1]           We do
not find it necessary to address the impact, if any, of Scarbrough’s vote for
the losing side in the November 2003 referendum.

 





[2]           METRO
argues that Scarbrough failed to preserve this complaint for appellate
review.  However, because her complaint
is related to the jurisdiction of the trial court to enter the order, it can be
raised for the first time on appeal.  See Tex.
Ass’n of Bus. v. Tex. Air Ctr’l Bd., 852 S.W.2d 440, 443–44 (Tex. 1993).