**Daphne SCARBROUGH, Appellant,**

v.

**The METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, Appellee.**

**No. 01–08–00792–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 31, 2010.

 .

 

 
 
 
 
 
 
 
 

 
 
 
 
 

 
 
 
 

 
 
 
 
 
 

 .

 .

Amanda Peterson, William A. Taylor, Andy Taylor & Associates, P.C., Houston, TX, for Appellant.

Andrew M. Edison, Edison, McDowell, & Hetherington, L.L.P., Gene L. Locke, Andrews & Kurth, L.L.P., Johnny W. Carter, Neal S. Manne, Robert S. Safi, Susman Godfrey, LLP, Houston, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

Appellant, Daphne Scarbrough, argues that the trial court erred in granting the plea to the jurisdiction of appellee, the Metropolitan Transit Authority of Harris County (METRO). In seven issues, she argues that: (1) the trial court erred in finding that she had no standing to sue because METRO's "Contract With the Voters" provides standing to property-tax payers and referendum voters; (2) the trial court erred in finding that she had no standing because even petition-signers, who have significantly less at stake, have previously been found to have standing to sue METRO over its "Main Street" Line; (3) the trial court erred in finding she had no standing because it improperly focused on how she voted rather than on whether she voted; (4) the trial court erred in finding she had no standing by misinterpreting the requisites for taxpayer standing in a way that would make it impossible for anyone to sue METRO; (5) the trial court erred by refusing to abate its hearing on METRO's plea to the jurisdiction until after the fact finder resolved disputed fact issues; (6) alternatively, if the trial court was correct in granting METRO's plea to the jurisdiction, it erred in ruling that Scarbrough take nothing and should have dismissed her case without prejudice; and (7) alternatively, the trial court erred by refusing to provide Scarbrough an opportunity to replead prior to dismissal of her case.

We modify the judgment and affirm as modified.

## Background

In the late 1990s, METRO began to develop a plan known as METRO Solutions, which was intended to increase transit options in the METRO service area by adding new rail and bus lines and by making contributions to street improvements. On August 28, 2003, METRO's board of directors approved resolution number 2003–93, providing notice of a special election

> for the purpose of submitting to the qualified electors of the Metropolitan Transit Authority of Harris County, Texas ... a proposition to authorize METRO to issue bonds, notes and other obligations payable, in whole or in part, from seventy-five percent (75%) of METRO's sales and use tax revenues

for the acquisition, construction, repair, equipping, improvement or extension of METRO's transit authority system, including the METRO Solutions transit system plan, as described herein, which includes bus service expansions and construction of extensions of METRO's rail system known as "METRORail," to approve such plan and construction of the METRORail and commuter line components thereof, and to dedicate twenty-five percent (25%) of METRO's sales and use tax revenues through September 20, 2014, for street improvements and mobility projects, as authorized by law and with no increases in the current rate of METRO's sales and use tax; and making other provisions related to the subject.

Metropolitan Transit Authority of Harris County, Resolution 2003–93 (Aug. 28, 2003) ("Resolution 2003–93").

METRO attached a copy of its resolution number 2003–77 ("Resolution 2003–77"), calling the special election, as an exhibit to its notice of special election. This resolution stated, in part,

> Section 14. METRO Agreements with the Voters. As authorized by Section 451.072 of the METRO Act and other applicable law, the Board hereby declares that, if a majority of the voters voting at the Election approve the Proposition, the following agreements will be binding on METRO and will constitute contracts with the voters in accordance with their terms and may not be repealed, altered or rescinded by any succeeding Board without voter approval at a subsequent election:
>
> (a) *The aggregate principal amount of bonds, notes or other obligations of METRO that are payable, in whole or in part, from seventy-five percent (75%) of METRO's sales and use tax revenues and are issued pursuant to*

> *the authority granted at this Election will never exceed $640,000,000;*
>
> (b) *Proceeds of the bonds, notes or other obligations authorized at the Election will be used to acquire, construct, repair, equip, improve or extend METRO's transit authority system, including the METRO Solutions Plan, provided that the only portions of METRORail for which such proceeds may be used are new segments included in Phase II of METRORail, as more particularly described in Exhibit A–4;*
>
> (c) *Approval of the Proposition at the Election constitutes approval of the METRO Solutions Plan, including the extensions and segments of METRORail and the construction of the METRORail and Commuter Line Components thereof* for purposes of the city charter of the City of Houston;
>
> (d) *METRO will not undertake the construction of any new segment of Phase II of METRORail with proceeds of the bonds, notes or other obligations authorized at the Election without first obtaining approval of the segment for federal capital assistance under applicable federal law and regulations or the commitment of a substantial amount of private funds;*
>
> (e) METRO's Street Improvement Dedication will be in force and effect through September 30, 2014, in accordance with the terms of such dedication, as described in Exhibit B;
>
> (f) Between November 1, 2009 and January 1, 2013, METRO will call an election seeking a local determination by voters regarding METRO's continuing support after September 30, 2014 for improvements of the types

described in Section 451.065 of the METRO Act;

(g) *Prior to November 1, 2009, METRO will not call any other election seeking voter approval to authorize METRO to issue bonds, notes or other obligations to provide any rail facilities other than Commuter Line Component, as more particularly described in Exhibit A–8 and depicted in Exhibit A–9, which are hereby made a part of this Resolution;* and

(h) METRO will not implement any increase in the rate of its currently existing, previously voted one percent (1%) sales and use tax.

(Emphasis added.)

Exhibit A–4, referenced in Section 14, paragraph (b) of Resolution 2003–77, provided the details of METRORail Phase II. In pertinent part, it stated:

METRORail *Phase II generally consists of the following light rail segments or lines,* including associated vehicles and facilities:

. . . .

**Westpark**

● *Approximately 6.6 miles westward from the Wheeler station on Phase I METRORail to the Hillcroft Transit Center, serving Greenway Plaza, West University, Bellaire and the Uptown/Galleria area.* This segment or line will have approximately 4 stations.

. . . .

Note: *Final scope, length of rail segments or lines and other details, together with implementation schedule, will be based upon demand and completion of the project development process, including community input.* The METRO Solutions Bus Component Park & Ride in the vicinity of Hobby Airport will be deferred until a later phase of the Southeast segment or line.

(Emphasis added.)

Finally, Exhibits A–8 and A–9, referenced in Section 14, paragraph (g) of METRO Resolution 2003–77, described the Commuter Line Components. Exhibit A–8 described the commuter line components, stating that they "generally consist" of "rail segments or lines, including associated vehicles and facilities," along U.S. 90A, U.S. 290, and "other commuter rail corridors within the METRO service area as are found to be feasible." This exhibit also contained the caveat that the "[f]inal scope, length of rail segments or lines and other details, together with implementation schedule, will be based upon demand and completion of the project development process, including community input." Exhibit A–9 was a "Transit System Plan" mapping the various lines discussed in Exhibit A–8.

The special election occurred on November 4, 2003, and voters approved the METRO Solutions Plan.

According to the affidavit of METRO's executive vice president, METRO's board of directors decided in 2007 to pursue light rail as the preferred transit mode for several of the lines discussed in the METRO Solutions Plan due to several factors, such as changes in the profitability of particular bus routes and in the availability of federal funding. This affected the Westpark segment of light rail lines connecting the Wheeler Station and the Hillcroft Transit Center authorized in the 2003 referendum. According to Scarbrough's pleadings, METRO currently plans to place a portion of that line in the center of the street on Richmond Avenue, where it will pass by Scarbrough's property.

On May 23, 2007, Scarbrough filed this suit against METRO as a voter who opposed the METRO Solutions transit sys-

tem plan in the 2003 referendum and as a residential property owner, commercial businesswoman and taxpayer in the City of Houston and Harris County, asserting claims for breach of contract, declaratory judgment, and unconstitutional impairment of contract and alleging that METRO was improperly implementing the terms of the November 2003 referendum election.

Scarbrough contends that Resolution 2003–93, with its exhibits, including Resolution 2003–77 authorizing the referendum and its exhibits, constitutes a "clear and unambiguous contract" between METRO and the voters and taxpayers and that METRO has failed to comply with the Resolution. She states that Metro has entered into a contract calling for early construction activities, whereas Resolution 2003–77 provides that METRO may not undertake the construction of any new segment of Phase II of METRORail with proceeds of the obligations authorized at the Election "without first obtaining approval of the segment for federal capital assistance." She further states that cost estimates for the project exceed the $640 million authorized by the Resolution. Finally, she contends that "Section 14 of the Resolution specifies that the agreements contained in subparagraphs (a)-(h) may not be 'repealed, altered or rescinded' without voter approval at a subsequent election," that "Section 14(c) makes clear that approval of the Resolution includes approval of the entire Metro Solutions Plan," that METRO is "not complying with the routes specified in the Resolution," and that the voters "did not authorize Metro to use any portion of Richmond Avenue for the portion of METRORail known as the Westpark route." Thus, she contends that the use of funds authorized by Resolution 2003–93 to construct any of the METRORail project on Richmond is illegal.

Scarbrough alleges that she has standing as a voter and taxpayer of property taxes and of METRO's use and sales tax because she will suffer significant financial damages "if METRO is allowed to proceed in violation of the Resolution." She further contends that, because her property and business on Richmond run along one of the streets METRO is proposing to use for the Westpark route, her use and enjoyment of the property will be harmed by the line and that the construction, operation, and maintenance of the line will affect her property rights and severely disrupt her business.

METRO filed a plea to the jurisdiction, arguing that Scarbrough could not assert standing as a voter, taxpayer, or property owner and that she lacked standing to litigate any issue related to bus service or to challenge METRO's distribution of "General Mobility Funds." METRO also argued that several of Scarbrough's issues were not ripe, were moot, or did not constitute justiciable controversies. Scarbrough amended her pleadings to include additional facts in support of the trial court's jurisdiction over the case, and she specifically argued that "[t]he case at bar demonstrates a legal and factual pattern where the merits are inextricably intertwined with certain jurisdictional facts," and thus a fact finder was required to resolve fact questions regarding the jurisdictional issue. Scarbrough also filed a separate motion asking the trial court to abate its hearing on METRO's plea to the jurisdiction until after a fact finder could address the "intertwined" facts pertaining to jurisdiction and the underlying merits.

The trial court denied Scarbrough's motion to abate and subsequently held a hearing on METRO's plea. On August 21, 2008, the trial court issued its "Order Granting METRO's Plea to the Jurisdiction and Dismissing Case," which stated,

The Court concludes that it does not have subject matter jurisdiction over Scarbrough['s] legal claims—for all of the reasons set forth in Metro's legal briefing. Therefore, the Court hereby grants Metro's plea to the jurisdiction. The Court orders that Scarbrough takes nothing because she has no standing to pursue the claims asserted. This is a final order, disposing of all issues and all parties.

This appeal followed.

## Standing

In her first four issues, Scarbrough argues that the trial court erred in finding that she did not have standing to bring her claims.

### A. Standing Generally

■ Standing is implicit in the concept of subject-matter jurisdiction, and subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). Thus, standing is never presumed, cannot be waived, and can be raised for the first time on appeal. *Id.* at 443–45. We review standing under the same standard by which we review subject-matter jurisdiction generally. *Id.* at 446. Whether the trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004).

■ A plea to the jurisdiction is a dilatory plea, which is intended to defeat a cause of action regardless of whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000). The pleader must allege facts that affirmatively demonstrate the trial court's jurisdiction to hear the case. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. If a plea to the jurisdiction challenges the existence of jurisdictional facts, as here, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *See Bland*, 34 S.W.3d at 555. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.*

■ Generally, unless standing is conferred by statute, a plaintiff must demonstrate that he "possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex.2001); *see also Tex. Ass'n of Bus.*, 852 S.W.2d at 446 ("The general test for standing in Texas requires that there (a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought.") (internal quotation omitted).

### B. Voter Standing

In her first issue, Scarbrough argues that she has standing as a voter and taxpayer to challenge METRO's planned use of bond and tax funds because representations made in exhibits attached to the notice of special election on the bond referendum created a "contract with the voters." In her second issue, Scarbrough argues that she has standing as a voter because even petition-signers, who have less interest at stake than she does as a voter, have standing. In her third issue, Scarbrough argues that how she voted is immaterial and that the fact that she voted, "without more, is sufficient to trigger standing to complain over METRO's inability or outright refusal to comply with contractual

terms of the 2003 Referendum." We first address Scarbrough's claim that she has standing as a voter to challenge the proposed application of bond funds.

■ With respect to Scarbrough's third argument, that she has standing as a voter in the 2003 referendum, without more, to challenge the proposed application of bond funds, we note that the Texas Supreme Court has pointed out that "[n]o Texas court has ever recognized that a plaintiff's status as a voter, without more, confers standing to challenge the lawfulness of governmental acts. Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large." *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex.2001). This limitation is informed by the two constitutional limitations on subject-matter jurisdiction—the separation of powers doctrine and Texas's open courts provision—which both require "an actual, not merely a hypothetical or generalized grievance." *Id.* Additionally, the Texas Supreme Court "has never recognized standing on the basis of the results—as opposed to the process—of an initiative election." *Id.*

In *Brown*, a plaintiff asserted "that he possess[ed] an injury distinct from the general public because he voted in [the referendum at issue], his vote was for the prevailing side, and Mayor Brown's executive order negated his vote." *Id.* The court held,

> [T]his proposed rationale for standing is too broad because the injury he identifies is not unique to him. Indeed, it is shared by all living Houstonians who were among the 198,563 electors who actually voted against the proposed ordinance. In no way does [the plaintiff's] status as a voter give him an interest sufficiently peculiar to satisfy our standing requirements.

*Id.* Similarly, Scarbrough's status as a voter, without more, does not confer standing because she is challenging the results of the election, not the process by which it was conducted and she has not asserted an injury unique to her that is not shared by every other Houstonian who voted in the November 2003 referendum.

Scarbrough also argues, however, that she has standing as a voter under *City of Houston v. Todd*, 41 S.W.3d 289, 302 n. 21 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). In *Todd*, Robb Todd, a city counsel member, and Allan Vogel, a voter who had signed a petition for a referendum on the city ordinance granting METRO the right to construct a light rail line along Main Street, sued the City of Houston and METRO when the City refused to hold an election on the referendum. *Id.* at 292–93. The petition, which Vogel signed but Todd did not, stated that a vote of the citizens of Houston was required by the city charter before METRO could construct the Main Street light rail line. *Id.* at 293.

This Court ruled against Vogel and the other plaintiff on the basis of the City's argument that the city charter provisions relied upon by the plaintiffs were preempted by provisions of the Texas Transportation Code and were not applicable to the complained—of ordinance. *Id.* at 295, 302. The Court did not address the issue of standing, except to state, "We note that appellee Vogel has standing...." *Id.* at 302 n. 21. The opinion cited *Blum v. Lanier*, which held that a qualified voter who spearheaded and signed an initiative petition had standing to challenge the form in which the referendum was put to the citizens. *See* 997 S.W.2d 259, 262 (Tex. 1999). Scarbrough does not challenge the form in which Resolution 2003–93 was put to the voters. Thus, she has not shown that *Todd* is relevant to this case. *See id.* at 295–302. Rather, the applicable rule is

that stated in *Brown,* in which the supreme court held that a plaintiff's status as a voter, without more, does not confer standing to challenge the lawfulness of governmental acts, that the plaintiff must allege some injury distinct from that sustained by the public at large, and that the court "has never recognized standing on the basis of the results—as opposed to the process—of an initiative election." *Brown,* 53 S.W.3d at 302.

Finally, Scarbrough contends that she has standing as a referendum voter and taxpayer to challenge METRO's alleged violations of section 14 of Resolution 2003–77, attached as an exhibit to Resolution 2003–93, the resolution approved by the voters in the 2003 referendum. She argues that the Texas Supreme Court has held that the terms of resolutions and orders calling a tax or bond election to approve financial undertakings of a governmental body become a contract with the voters. Scarbrough cites several cases regarding "contracts with the voters" in her argument asserting that she has standing. *See San Saba County v. McCraw,* 130 Tex. 54, 108 S.W.2d 200, 202–03 (1937); *Fletcher v. Howard,* 120 Tex. 298, 39 S.W.2d 32, 34 (1931); *Black v. Strength,* 112 Tex. 188, 246 S.W. 79, 80 (1922); *Moore v. Coffman,* 109 Tex. 93, 200 S.W. 374, 374–75 (1918); *Taxpayers for Sensible Priorities v. City of Dallas,* 79 S.W.3d 670, 676 (Tex.App.-Dallas 2002, pet. denied). However, one of these, *San Saba County,* did not involve a suit of a citizen voter against a governmental entity; rather, it was a suit by a county attempting to compel the attorney general to approve the funding of certain road and bridge bonds. *See San Saba County,* 108 S.W.2d at 201. The remaining cases all address suits by voters who were also property taxpayers to require a govern-

mental entity to use the bond funds for the purpose for which they were approved. *See Fletcher,* 39 S.W.2d at 32–33; *Black,* 246 S.W. at 80; *Moore,* 200 S.W. at 374–75; *see also Taxpayers for Sensible Priorities,* 79 S.W.3d at 675–76. Thus, we conclude that these cases are more properly characterized as *taxpayer* suits. *See Bland,* 34 S.W.3d at 555 (characterizing as taxpayer challenge action by taxpayers seeking permanent injunction against payments by school district under lease-purchase agreement for new high school that they claimed violated the Public Property Finance Act, Tex. Local Gov't Code § 271.004, providing for voter approval of contracts for purchase or improvement of real property by school districts). Therefore, we address these cases in the next section.

We hold that Scarbrough's status as a voter in the November 2003 bond referendum, without more, does not confer standing on her to sue METRO for its alleged misuse of bond funds whose issuance was authorized by the referendum.[1]

We overrule Scarbrough's first, second, and third issues insofar as they allege her standing as a voter in the November 2003 referendum.

## C. Taxpayer Standing

In her first and fourth issues, Scarbrough argues that she has standing to sue on METRO's alleged "contract with the voters" as a voter and taxpayer. Scarbrough contends that METRO's expenditure of public taxpayer funds on its current light rail plans would be illegal because those plans were not authorized by the 2003 resolution and referendum.

█ The Texas Supreme Court addressed taxpayer standing to sue a public

---

1. We do not find it necessary to address the impact, if any, of Scarbrough's vote for the

losing side in the November 2003 referendum.

entity for the alleged misappropriation of public funds in *Bland.* 34 S.W.3d at 549. The supreme court recognized the rule that,

> [i]n general, taxpayers do not have a right to bring suit to contest government decision-making because, as we observed more than half a century ago in *Osborne v. Keith,* [142 Tex. 262, 177 S.W.2d 198 (1944) ] "[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review."

*Id.* However, while recognizing that "taxpayers must show as a rule that they have suffered a particularized injury distinct from that suffered by the general public in order to have standing to challenge a government action or assert a public right," the court also recognized the "long-established exception to this rule," under which "a taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, even without showing a distinct injury." *Id.* at 555–56. The court recognized that the exception, "strictly limited, provides important protection to the public from the illegal expenditure of public funds without hampering too severely the workings of the government." *Id.* at 556–57 (refusing to apply taxpayer exception where contract sought to be enjoined had already been performed and suit was, therefore, moot, and concluding that potential for disruption of government operations was too great to allow taxpayer with no special injury distinct from general public to sue to prohibit government for paying for goods and services already received).

Here, Resolution 2003–93 provided notice of a special election "for the purpose of submitting to the qualified electors of the Metropolitan Transit Authority of Harris County, Texas ... a proposition to authorize METRO to issue bonds, notes and other obligations payable, in whole or in part, from seventy-five percent (75%) of METRO's sales and use tax revenues for the acquisition, construction, repair, equipping, improvement or extension of METRO's transit authority system, including the METRO Solutions transit system plan, as described herein." It is undisputed that METRO's sole tax support comes from a one percent sales tax, and it is likewise undisputed that Scarbrough, a voter in the 2003 referendum on Resolution 2003–93, pays both this sales tax and property tax. Scarbrough argues, therefore, that her payment of this sales tax and her status as a landowning property-tax payer confer standing on her as a taxpayer to challenge METRO's current plan for rail on Richmond as an illegal expenditure of public funds under the exception to the general taxpayer standing rule.

METRO argues that Scarbrough does not have taxpayer standing because the Texas Transportation Code restricts METRO from imposing *ad valorem* property taxes, and thus the only tax Scarbrough pays to METRO is the one percent sales tax, which the Texas Supreme Court has unequivocally held is insufficient to confer standing. Scarbrough argues that applying this rule to conclude that she lacks standing to sue METRO would make it impossible for anyone to sue METRO.

To support her claims that she has standing as a sales tax and property tax payer to challenge METRO's alleged improper diversion of funds from the proceeds of obligations authorized to be issued by the 2003 Referendum, Scarbrough relies on *Williams v. Lara,* in which the Texas Supreme Court considered taxpayer standing to oppose the expenditure of public funds to support the Chaplain's Education Unit (CEU) within the Tarrant

County Corrections Center (TCCC). 52 S.W.3d at 175. One of the plaintiffs paid only sales tax; the other paid sales and property tax. The supreme court held that taxpayers may fall under the limited taxpayer exception to the general rule that a plaintiff must demonstrate that he possesses an interest in a conflict distinct from that of the general public. *Id.* at 179 (citing *Bland*, 34 S.W.3d at 556). "Taxpayers in Texas have standing to enjoin the illegal expenditure of public funds, and need not demonstrate a particularized injury." *Id.* This limited exception to the general rule requires that the plaintiff be a taxpayer and that public funds be expended on the allegedly illegal activity. *Id.* The court further held that whether the plaintiff has taxpayer standing depends upon the type of tax she claims to have paid. *Id.*

 In *Williams*, the supreme court expressly held that "paying sales tax does not confer taxpayer standing upon a party." *Id.* at 180. In reaching this conclusion, the court reasoned:

> Taxpayer standing is a judicially created exception to the general standing rule. We have already limited the applicability of this exception by narrowly defining the type of action a taxpayer can maintain. A taxpayer may maintain an action solely to challenge proposed illegal expenditures; a taxpayer may not sue to recover funds previously expended, or challenge expenditures that are merely "unwise or indiscreet." Underpinning these limitations is the realization that "[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." Extending taxpayer standing to those who pay only sales tax would mean that even a person who makes

incidental purchases while temporarily in the state could maintain an action. This would eviscerate any limitation on taxpayer suits. It would allow a person with virtually no personal stake in how the public funds are expended to come into court and bring the government's actions under judicial review. This is not what this Court envisioned in crafting the taxpayer-standing exception.

*Id.* (internal citations omitted). Although the court held that the plaintiff who paid only sales tax lacked standing, it also held that the plaintiff who paid property taxes did satisfy the taxpayer requirement, and it stated that "[t]he dispositive issue regarding [his] standing is whether Tarrant County is actually expending public funds in operating the [allegedly unconstitutional entity, the CEU]." *Id.* at 180–81.

Because it was dealing with a case of first impression, the supreme court in *Williams* looked to federal cases dealing with the issue of "what constitutes expending public funds." *Id.* at 181. The court stated that it would "look to the jurisprudence of municipal taxpayer standing to guide [it] in determining whether" the county was expending public funds in operating the CEU. *Id.* It cited multiple federal cases supporting the proposition that "[m]unicipal taxpayers need only establish that they pay taxes to the relevant entity, and that public funds are expended on the allegedly unconstitutional activity." *Id.* It further stated that to be entitled to taxpayer standing a plaintiff "must prove that the government is actually expending money on the activity that the taxpayer challenges" and that "merely demonstrating that tax dollars are spent on something related to the allegedly illegal conduct is not enough." *Id.* The court went on to state that the record in *Williams* established that the county was using tax dollars to manage the allegedly unconsti-

tutional CEU because county-paid employees oversaw, managed, and "spent a significant amount of the County's time operating" the unit. *Id.* at 182–83. Implicit in this reasoning is the fact that the property tax paid by the plaintiff was paid to the county, the entity that was supporting the allegedly illegal activity.

Concerning Scarbrough's standing as a taxpayer, we note that while the supreme court prohibited extension of standing to challenge the expenditure of public funds to someone who paid only sales tax, Scarbrough does not fall into this category. The fact that she also pays property tax addresses the concern raised in *Williams* that "[e]xtending taxpayer standing to those who pay only sales tax would mean that even a person who makes incidental purchases while temporarily in the state could maintain an action." *Id.* at 180. However, this distinction is insufficient to overcome the bright-line rule in *Williams* that standing to challenge the expenditure of public funds as illegal cannot be derived from the payment of sales tax due to policy concerns. Thus, we must look to Scarbrough's standing as a property-tax payer.

The relationship between Scarbrough's payment of property taxes here and the anticipated allegedly illegal expenditures by METRO is much more attenuated than the relationship between the expenditure of tax funds and the allegedly unconstitutional expenditure of those funds in *Williams*. In *Williams*, the plaintiff paid property taxes directly to the entity, Tarrant County, which supported the allegedly illegal CEU activity in the TCCC. *See id.* at 181 ("To be entitled to municipal taxpayer standing, a litigant must prove that the government is actually expending money on the activity that the taxpayer challenges; merely demonstrating that tax dollars are spent on something related to the allegedly illegal conduct is not

enough."); *see also Bland,* 34 S.W.3d at 556 (explaining that exception allowing taxpayer standing to sue to enjoin expenditure of illegal funds is justified because "[w]hen a taxpayer brings an action to restrain the illegal expenditure ... of tax money, he sues for himself, and it is held that his interest in the subject-matter is sufficient to support the action") (quoting *Hoffman v. Davis,* 128 Tex. 503, 100 S.W.2d 94, 96 (1937)).

By contrast, in approving Resolution 2003–93, about which Scarbrough complains, the voters authorized the funding of the METRO transit system plan as described in the resolution by the issuance of bonds, notes and other obligations payable from METRO's sales and use tax revenue, as well as by "federal capital assistance under applicable federal law and regulations or the commitment of a substantial amount of private funds." *See* Resolution 2003–93 (proving notice of special referendum election and including as exhibit Resolution 2003–77, ¶¶ (a), (d), calling special election). The referendum did not authorize METRO to use any property taxes to fund the implementation of the authorized transit plan. Thus, Scarbrough cannot argue that any of her property taxes are being used to fund the complained-of activity.

The "contract with voters" cases cited by Scarbrough similarly fail to accord her standing. Each of these cases acknowledged the standing of property-tax payers obligated to pay through their taxes for bonds issued for public construction projects pursuant to voter approval in a bond election. *Fletcher,* 39 S.W.2d at 34; *Black,* 246 S.W. at 80; *Moore,* 200 S.W. at 374–75; *Taxpayers for Sensible Priorities,* 79 S.W.3d at 676. Each of these cases involved a suit brought by property taxpayers who had voted to issue bonds to be paid for from general tax revenues, in-

cluding from their property taxes. *See Fletcher*, 39 S.W.2d at 32–33 (treating pre-election orders as contract between commissioners' court and "electorate entitled to vote at said election" and overturning dismissal of voter and property-tax payer suit alleging diversion of proceeds from sale of bonds issued for use on certain public road); *Black*, 246 S.W. at 80 (holding that county commissioners' court that had adopted order designating roads to be improved if bond issue carried could not designate other roads to be improved with proceeds of bonds after election contrary to "the will of those having to bear the bond burden"); *Moore*, 200 S.W. at 374–75 (in action by property owners subject to tax for bond issued pursuant to county bond election, affirming injunction against diversion of proceeds of bond sales to construction of bridge at different location than presented in petition for bond election); *see also Taxpayers for Sensible Priorities*, 79 S.W.3d at 675–76 (holding, following sale of general obligation bonds approved by city voters to develop waterway project and initiation of work on project, "It is elementary that the proceeds of bonds voted by the people must be expended for the purposes for which they were voted."). Scarbrough does not have standing under the foregoing cases through her payment of property taxes because in each of those cases the bonds authorized burdened property tax payers, whereas the bonds and other obligations authorized to be issued by voter approval of Resolution 2003–93 are payable only from METRO's sales and use tax revenues.

We decline to extend the very limited taxpayer exception to the general taxpayer standing rule based on the attenuated relationship between Scarbrough's tax payments and the funding of METRO's transit plan authorized by Resolution 2003–93.

We overrule Scarbrough's fourth issue.

## D. Standing as an Affected Property Owner

■ Scarbrough also impliedly contends that she does have a "personal stake in whether METRO complies with the Resolution" because METRO intends to construct a portion of the METRORail "right in front of her home and business." Her petition alleges concerns over the disruption caused by the construction and other alleged dangers and inconveniences. However, Scarbrough concedes that "it is true that [she] is not alleging or currently able to prove that METRO has taken her property" and that "a takings claim is not yet ripe."

■ Both ripeness and standing are components of subject-matter jurisdiction. *McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 232, 234 (Tex.2001). Standing prohibits suits by those who are not personally aggrieved. *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex.2008). The ripeness doctrine prohibits suits involving "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex.2001). An issue is ripe for decision when at the time a lawsuit is filed the facts are sufficiently developed "so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–52 (Tex.2000).

There was no evidence at the time the trial court ruled that METRO's proposed construction would occur on any part of Scarbrough's property or that she would be denied access to or restricted in the use of her property, nor do Scarbrough's pleadings assert such claims. Rather, she concedes that as of the time of the trial court's ruling, any claims she might have

related to her use or enjoyment of her property or to a taking by METRO were not ripe for adjudication. Thus, Scarbrough acknowledges and we agree that the likelihood of injury to her depended on factors too speculative to address at the time of the trial court's ruling and that any such claims were, therefore, not ripe for decision. *See Perry*, 66 S.W.3d at 250; *Gibson*, 22 S.W.3d at 851–52.

We conclude that Scarbrough's claims based on her status as a property owner were not ripe at the time of the trial court's ruling, and thus this ground did not confer subject-matter jurisdiction on the trial court.

### E. Standing Hearing & Opportunity to Replead

■■ In her fifth issue, Scarbrough argues that the trial court erred by refusing to abate its hearing on standing until after a trial on the merits. However, standing is implicit in the trial court's subject-matter jurisdiction to consider a case. *Tex. Ass'n of Bus.*, 852 S.W.2d at 443. Thus, the trial court correctly considered the jurisdictional challenge raised by METRO before proceeding to a trial on the merits of Scarbrough's claims. *See id.*

Scarbrough argues, however, that "[t]he case at bar demonstrates a legal and factual pattern where the merits are inextricably intertwined with certain jurisdictional facts." Specifically, she argues that a jury trial was necessary to determine standing because the question of standing was intertwined with the merits of whether the resolution in question authorized METRO to construct a light rail line along Richmond Avenue. She argues, "This is precisely the type of situation that the Texas Supreme Court had in mind when it decided the *Miranda* case: '[i]f the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot

grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder.'" *See Miranda*, 133 S.W.3d at 227–28. We disagree.

The alleged contract with the voters upon which Scarbrough bases her claims consists of Resolution 2003–93, i.e., the bond proposition itself, together with its exhibits, which the 2003 referendum approved, not extraneous documents. *See Taxpayers for Sensible Priorities*, 79 S.W.3d at 676 (holding that extraneous documents were not part of contract with voters created by voter approval of bond proposition). Thus, the ripe issues raised in Scarbrough's petition are questions of law regarding the construction of the terms of the Resolution, not questions of fact regarding the details of the Resolution's implementation. The facts material to a determination of Scarbrough's standing as to her ripe claims are complete, are jurisdictional, and are largely uncontested. No additional discovery is necessary to determine Scarbrough's standing to assert her ripe claims, hence to decide the plea to the jurisdiction. *See Bland*, 34 S.W.3d at 555 (holding that we consider relevant evidence submitted by parties when necessary to resolve jurisdictional issues raised); *Miranda*, 133 S.W.3d at 227–28 (holding that if relevant evidence is undisputed or fails to raise fact question on jurisdictional issue trial court rules on plea to jurisdiction as matter of law).

We overrule Scarbrough's fifth issue.

In her seventh issue, Scarbrough argues that even if the trial court correctly determined that she lacked standing to bring her claim, it erred in refusing to allow her to replead.

■■ If a plaintiff fails to plead sufficient facts affirmatively demonstrating the trial court's jurisdiction, but the pleadings do not affirmatively demonstrate incurable

defects in jurisdiction, he should be afforded the opportunity to amend. *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002).

Here, the challenge to jurisdiction was not made based on Scarbrough's pleadings, but on the jurisdictional facts presented in the trial court. Because the jurisdictional facts upon which we rely were largely uncontested and because Scarbrough has otherwise failed to indicate that there is any genuine fact issue to be resolved, and thus her lack of standing cannot be changed by merely repleading her case, we need not remand. *See Miranda,* 133 S.W.3d at 226–28 ("If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend.... [I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.").

We overrule Scarbrough's seventh issue.

### Terms of Judgment

In her sixth issue, Scarbrough argues that, even if the trial court correctly determined that she lacked standing to bring her claims, it erred in issuing a take-nothing judgment against her, rather than dismissing her claims without prejudice. Scarbrough is correct that the trial court's lack of jurisdiction prevented it from entering a judgment on the merits. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 443 (holding that standing is implicit in trial court's subject matter jurisdiction to consider case). However, the trial court's order here does not enter a judgment on the

merits. Its order was titled "Order Granting METRO's Plea to the Jurisdiction and Dismissing Case." However, it stated, "The Court orders that Scarbrough takes nothing because she has no standing to pursue the claims asserted." Thus, we modify the trial court's order to make it clear that Scarbrough's claims are dismissed for lack of jurisdiction and that the trial court's judgment was not an adjudication on the merits of any claim she may have over which she is able to establish subject-matter jurisdiction.[2]

We sustain Scarbrough's sixth issue.

### Conclusion

We modify the trial court's judgment dismissing Scarbrough's claims to clearly reflect that her case was dismissed for lack of jurisdiction and affirm it as modified.

---

2. METRO argues that Scarbrough failed to preserve this complaint for appellate review. However, because her complaint is related to the jurisdiction of the trial court to enter the order, it can be raised for the first time on appeal. *See Tex. Ass'n of Bus. v. Tex. Air Ctr'l Bd.,* 852 S.W.2d 440, 443–44 (Tex.1993).