

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00050-CV

———————————————

G.C. ELLIS, MARY ELLIS, DAVID A. SAMPSON, KAREN ANN SAMPSON, CHRISTOPHER BANCROFT, BELLE FOURCHE RESOURCES LLC, AND COMPADRE CATTLE COMPANY LLC, Appellants

V.

WILDCAT CREEK WIND FARM LLC, Appellee

AND

G.C. ELLIS, MARY ELLIS, DAVID A. SAMPSON, KAREN ANN SAMPSON, CHRISTOPHER BANCROFT, BELLE FOURCHE RESOURCES LLC, AND COMPADRE CATTLE COMPANY LLC, Appellants and Appellees

V.

COOKE COUNTY, TEXAS, COOKE COUNTY COMMISSIONERS COURT, AND JOHN KLEMENT, Appellees and Appellants

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV19-00455

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellants are a group of property owners in Cooke County (the Property Owners). They brought suit to challenge a resolution that created a reinvestment zone—a preliminary step in creating tax incentives for Appellee Wildcat Creek Wind Farm LLC to build a wind power plant or "wind farm" in Cooke County. To that end, the Property Owners sued Wildcat and the other Appellees, who are a group of government defendants from Cooke County. The trial court granted Appellees' dispositive motions and denied or dismissed all of the Property Owners' claims.

The Property Owners allege that they have suffered damage to their property values due to the anticipated construction of a wind farm. But at root, that harm appears to have little to do with Appellees' challenged actions (a prelude to the creation of tax incentives) and more to do with contingent future events that may never come to pass (the eventual construction of a wind farm). We therefore conclude that the Property Owners have not carried their initial burden to demonstrate ripeness and standing. We vacate the trial court's judgment and dismiss the case for want of jurisdiction.

**I.**

In 2019, Wildcat's parent company EDP Renewables approached the Cooke County Commissioners Court (CCCC) about EDP's plan to build a wind farm in Cooke County. EDP proposed to enter a tax abatement agreement with CCCC to help support the project, whereby CCCC would agree to abate a portion of the

3

property taxes on the wind farm for the next ten years. The first step in securing an abatement agreement would be designating the project area as a reinvestment zone pursuant to Texas Tax Code Chapter 312.

CCCC was amenable to the plan, and it kicked off the designation process by arranging the public hearing that the statute requires. *See* Tex. Tax Code Ann. § 312.201(d). At the hearing, CCCC's commissioners heard public comment on the creation of the reinvestment zone, and a project manager for EDP spoke to the court about the nature of the Wildcat project. County Judge Jason Brinkley clarified that the only thing that was up for debate was the creation of the reinvestment zone; discussion of any specific tax abatements would occur later.

During debate, CCCC Commissioner John Klement fielded a question about whether he had a possible conflict of interest because some of his family members owned land within the reinvestment zone. Commissioner Klement explained that because the reinvestment zone did not come with any money benefit, he could legally vote on the measure. However, he explained that when it came time for CCCC to pass on any abatement agreement, "I will not have a vote" in light of the potential conflict. CCCC, including Commissioner Klement, then unanimously passed a resolution (five votes to none) to create the reinvestment zone.

To challenge the creation of the reinvestment zone, the Property Owners filed this suit against Wildcat and a group of governmental defendants including Commissioner Klement, CCCC, and Cooke County itself (the County Defendants).

4

The centerpieces of the Property Owners' challenge were (1) Commissioner Klement's alleged breach of rules concerning conflicts of interest and (2) CCCC's alleged failure to include certain statutory findings in the resolution (or, to the extent that CCCC made the required findings, that those findings were unsupported). The Property Owners pleaded various claims:

- As to the County Defendants,
    - A mandamus claim to compel CCCC to set the resolution aside;
    - Temporary and permanent injunctions barring CCCC from giving effect to the resolution, from considering Wildcat's application for an abatement agreement, from allowing Commissioner Klement to participate in any Wildcat-related proceedings, et cetera;
    - Declaratory relief to the effect that Commissioner Klement violated disclosure rules concerning conflicts of interest and that the resolution was void as a result; and
    - Inverse condemnation in that CCCC had regulatorily taken the Property Owners' property by passing the resolution.
- As to Wildcat,
    - That Wildcat was unjustly enriched by an illegal tax abatement agreement; and

o A claim for regulatory estoppel, i.e., that Wildcat's projections concerning the economic benefits of the wind plant should be held binding on the company.[1]

The County Defendants filed a plea to the jurisdiction arguing that the Property Owners lacked standing and that their claims were unripe, along with a Rule 91a motion. Wildcat filed several types of attacks on the Property Owners' claims including, as pertinent to this appeal, a plea to the jurisdiction arguing lack of standing.

The trial court rendered a final judgment that largely ruled in Appellees' favor. As relevant here, the trial court denied the pleas to the jurisdiction as to the mandamus and inverse condemnation claims but granted the pleas as to the unjust enrichment and regulatory estoppel claims. The trial court also denied the injunctive relief claim on its merits, dismissed the inverse condemnation claim without prejudice, granted a declaration that Commissioner Klement had violated conflict disclosure rules, and denied declaratory relief in all other respects.

---

[1]Early in their petition, the Property Owners let it be known that they would be pleading causes of action against Wildcat for "Misrepresentation," "Unclean hands," and "Violation of law," as well as claims against Commissioner Klement for violation of their constitutional rights and the law in general. However, the Property Owners did not subsequently flesh out these labels with any actual pleading concerning what these claims might have entailed, and the trial court ignored all of these would-be claims in its final order except to say that the misrepresentation claim was dismissed with prejudice. Regardless, the Property Owners have not mentioned these other claims on appeal, and the existence of these claims, vel non, does not affect our analysis.

## II.

The Property Owners appealed the denial and dismissal of their claims. The Property Owners generally focus on the merits of whether conflict rules were violated and their prayer to set the resolution aside.

The County Defendants cross-appealed, arguing that the trial court lacked jurisdiction. Their first issue revolves around the justiciability concerns of standing and ripeness.

We agree with the County Defendants that a lack of standing and ripeness requires us to dismiss the case. We therefore do not consider the Property Owners' arguments concerning the merits.

## A.

Standing is a prerequisite to subject matter jurisdiction, and subject matter jurisdiction is essential to a court's power to decide a case. *Garcia v. City of Willis*, 593 S.W.3d 201, 206 (Tex. 2019). Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction. *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011); *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998).

Standing and ripeness are questions of law that we review de novo. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 149–50 (Tex. 2012). The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Id.* at 150. When assessing a plea to the jurisdiction, our analysis begins with the live pleadings. *Id.* We construe

7

the plaintiff's pleadings liberally, taking all factual assertions as true and looking to the plaintiff's intent. *Id.*

"In ruling on a defendant's plea to the jurisdiction, courts should decide the plea without delving into the merits of the case." *Farmers Tex. Cty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020) (cleaned up). But a court is not required to look solely to the pleadings; it may consider evidence, and it must do so when necessary to resolve the jurisdictional issues raised. *Id.* "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* "When undisputed evidence supports the plea to the jurisdiction and implicates the merits of the case, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* (cleaned up). If, after examining the pleadings and any undisputed evidence, the court concludes that standing or ripeness does not exist, the case must be dismissed. *See id.*

**B.**

"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018). Under Texas law, the standing inquiry begins with determining whether the plaintiff "himself (rather than a third party or the public at large), suffered the injury." *Heckman*, 369 S.W.3d at 155. The

8

plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Meyers*, 548 S.W.3d at 485 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992) (plurality op.)).

The second element requires that the plaintiff's alleged injury be "fairly traceable" to the defendant's conduct. *Id.* "This required showing of a causal connection between the plaintiff's injury and the defendant's conduct serves as a means of identifying the proper defendants." *Id.*

To establish the third standing requirement, a plaintiff must show that there is a substantial likelihood that the requested relief will remedy the alleged injury. *Id.* "If, for example, a plaintiff suing in a Texas court requests injunctive relief[,] but the injunction could not possibly remedy his situation, then he lacks standing to bring that claim." *Id.* (quoting *Heckman*, 369 S.W.3d at 155).

"Ripeness doctrine is invoked to determine whether a dispute has yet matured to a point that warrants decision." *Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001). "Ripeness concerns not only whether a court *can* act—whether it has jurisdiction— but prudentially, whether it *should.*" *Id.* at 249–50. Under the ripeness doctrine, we consider whether the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Robinson*, 353 S.W.3d at 755. Ripeness thus focuses on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all. *Perry*, 66

S.W.3d at 250. In assessing ripeness, we should evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Id.*

"The standing question thus bears close affinity to questions of ripeness—whether the harm asserted had matured sufficiently to warrant judicial intervention . . . ." *Warth v. Seldin*, 422 U.S. 490, 499 n.10, 95 S. Ct. 2197, 2205 n.10 (1975).[2] "In many cases the two problems of standing and ripeness are merged; a party may lack standing because what has happened to him is not far enough developed, but the lack of development may be the essence of unripeness." *Patterson*, 971 S.W.2d at 442. Both standing and ripeness emphasize "the need for a concrete injury for a justiciable claim to be presented." *Id.*

## C.

We conclude the Property Owners have not established standing or ripeness. The failure to establish either one would be sufficient to deprive jurisdiction. But because both standing and ripeness are different faces of the same die (justiciability), we discuss them both.

For purposes of standing, the County Defendants maintain that the Property Owners have not demonstrated a particularized, concrete injury that stands distinct from the generalized harm to the public at large. In the trial court, the Property

---

[2]Although Texas law governs the justiciability of the Property Owners' claims, Texas's justiciability law parallels federal law, and Texas courts often cite federal law for guidance on the subject. *See Meyers*, 548 S.W.3d at 485; *Perry*, 66 S.W.3d at 249.

Owners alleged multiple forms of injury that could factor into the particularized injury analysis, including increased taxes, decreased county services, environmental harm, violation of their due process rights, and diminution of their property values. But on appeal, the Property Owners concentrate on the last two interests: their due process rights and property values.

As to due process, the Property Owners argued in their petition, as grounds for injunctive relief, that they had a due process right to "require [that] local government entities, vendors, and local government officials abide by federal, state, and local regulations when conducting public business." This alleged interest[3] does not provide a basis for standing. Generally, a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts. *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7 (Tex. 2011). "[T]he proper inquiry is whether the plaintiffs sue solely as citizens who insist that the government follow the law." *Id.* at 8.

As to property values, the Property Owners point to their affidavits, which emphasized their concerns that the construction of a wind farm will lower the worth of their nearby homes and land. For example, in his affidavit, GC Ellis attested that he owns over 700 acres of land within the reinvestment zone and that he and his wife live at a house located less than half a mile from the zone. He explained, "I am

---

[3] "A two-part test governs a due-process claim: we must determine whether petitioners (1) have a liberty or property interest that is entitled to procedural due process protection; and (2) if so, we must determine what process is due." *Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019) (cleaned up).

11

concerned property values will decrease. Numerous sources report that property values decrease by approximately 25% to 40% when wind farms are built nearby." According to Ellis's affidavit, nearby properties "are already declining in value given the anticipated wind farm construction." The other Property Owners submitted similar affidavits.

To the County Defendants, this is not enough. They say that the Property Owners' claims rest on "[a] complaint about a hypothetical diminution of their property values that may or may not occur." In the County Defendants' view, a complaint about diminished property values is one that would be felt by the public at large, not particularly by the Property Owners.

We will assume without deciding that diminished property values may be, in general, sufficiently particularized to show injury in fact for purposes of the first element of standing.[4] But even operating under that assumption, the Property Owners' claims suffer from a lack of ripeness. While the Property Owners have alleged that their property values are already declining, their harm is nonetheless wholly dependent on whether or not a wind farm is eventually constructed; they do not dispute that if the wind farm is never built, their property values will ultimately

_____

[4]There is authority to support the view that harm to an individual's property values may, in appropriate circumstances, constitute an injury in fact. *See, e.g.*, *Tex. Water Dev. Bd. v. Ward Timber, Ltd.*, 411 S.W.3d 554, 563–66 (Tex. App.—Eastland 2013, no pet.); *City of Laredo v. Rio Grande H20 Guardian*, No. 04-10-00872-CV, 2011 WL 3122205, at *4–5 (Tex. App.—San Antonio July 27, 2011, no pet.) (mem. op.); *Hays Cty. v. Hays Cty. Water Planning P'ship*, 106 S.W.3d 349, 357 (Tex. App.—Austin 2003, no pet.).

remain intact. Thus, while their claims nominally concern the County Defendants'

actions, their harm rests almost entirely on future events that at this stage are

contingent, hypothetical, and remote. *See Perry*, 66 S.W.3d at 250. From a ripeness

perspective, all that has actually occurred—or will imminently occur—is a prelude:

the designation of a reinvestment zone. But even though CCCC has passed the

resolution to designate the reinvestment zone, will Wildcat and CCCC eventually

enter a tax abatement agreement? *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 825 F.

Supp. 2d 142, 154–55 (D.D.C. 2011) (concluding that claim to enjoin government

from giving financial incentives to support a power generation project was not ripe

because government had not finally committed to provide the incentives). And if

they enter an abatement agreement, will the abatement lead Wildcat to construct a

wind farm that, in turn, would seal the fate of the Property Owners' property values?

Based on this record, it is impossible to tell. *See, e.g.*, *Scarbrough v. Metro. Transit Auth. of*

*Harris Cty.*, 326 S.W.3d 324, 337–38 (Tex. App.—Houston [1st Dist.] 2010, pet.

denied); *City of Anson v. Harper*, 216 S.W.3d 384, 390 (Tex. App.—Eastland 2006, no

pet.). Thus, the Property Owners' constitutional harm rests on eventualities that may

never be realized.

Evidence that was attached to the Property Owners' own petition demonstrates

the trouble in predicting these future events. At the public hearing before CCCC,

EDP's representative explained that successfully developing a wind power project is

dependent on multiple variables: whether the land in question is sufficient for the full

project footprint; whether the utility is able to obtain the necessary agreements (leases, rights of way, etc.) from the relevant stakeholders; whether the utility is able to sufficiently verify a usable flow of wind in the area; whether, at the proposed site, the utility is able to access existing or planned high-voltage transmission lines with unspent capacity to carry the energy; whether the utility is able to obtain the necessary local, state, and federal permits for the project; whether the utility is able to market the energy produced; and whether the utility is able to secure financing for the project—just one aspect of which is the ability to obtain applicable incentives, such as the tax abatements at issue here. EDP further explained this multistage endeavor might typically take six years to complete, if it was successfully completed at all. With the project depending on so many variables and occurring across such a long and uncertain timeframe, ripeness becomes an acute concern.

And the Property Owners have not advanced any reason to believe that withholding court consideration of the merits will result in a hardship for the parties. *See Perry*, 66 S.W.3d at 250. "Should facts change and events occur which trigger a real need for action . . . , the courts will be available to adjudicate such claims which may arise." *See Jurist v. Long Island Power Auth.*, 19 CV 3762 (MKB)(LB), 2021 WL 62217, at *7 (E.D.N.Y. Jan. 6, 2021) (report and recommendation) (concluding that there was no hardship, for ripeness purposes, in withholding decision on a suit challenging government action that would supposedly lead to the construction of a wind farm at some unknown point in the future).

14

Further justiciability problems arise when considering the second component of standing, which asks whether the plaintiff's injury is fairly traceable to the defendant's conduct in the sense of causation. *See Meyers*, 548 S.W.3d at 485. As to this element, the Property Owners are at something of a disadvantage because of the indirect nature of their claims, especially against the County Defendants. The Property Owners' claims revolve around CCCC's vote to establish a reinvestment zone, yet it cannot credibly be argued that the Property Owners' property values have been directly harmed by CCCC's action of designating a reinvestment zone or Commissioner Klement's challenged conduct in support of those actions. Rather, it is Wildcat's anticipated construction of a wind farm that will ultimately do the alleged damage to the Property Owners' property values; in the final analysis, any harm to the Property Owners' property values would only be indirectly traceable to the County Defendants' actions *toward Wildcat*, not the Property Owners. If "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562, 112 S. Ct. at 2137 (internal quotation omitted). "When, . . . as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.*, 112 S. Ct. at 2137.

That hurdle has not been cleared here. According to the Property Owners' implicit reasoning, the indirect harm lies at the end of a lengthy causative chain: without Commissioner Klement's vote, the resolution designating a reinvestment

15

zone would not have passed; without the reinvestment zone, there would be no tax abatement agreement; without a tax abatement, Wildcat, in its independent financial judgment, would decide not to build a wind farm; and without a wind farm, the Property Owners' property values would not ultimately and permanently decline.

At least two of the links in this chain are flawed. To begin, the first link in the causative chain is that without Commissioner Klement's conflict-tainted vote, the resolution designating a reinvestment zone would not have passed. Yet Commissioner Klement's vote was just one out of five votes in favor of the designation. Even subtracting Commissioner Klement's vote, that leaves a unanimous four in favor of the designation. Indeed, as the Property Owners conceded in their petition, "On the face of it, it appears the Resolution would have passed[] even without Klement's vote." The undisputed state of the voting record, and the Property Owners' concession concerning that record, would seem to obstruct the causative line between the County Defendants' conduct and the Property Owners' harm. *Cf. Brown v. Todd*, 53 S.W.3d 297, 304 (Tex. 2001) (summarizing how the traceability requirement applies to voting challenges concerning deliberative bodies (quoting *Raines v. Byrd*, 521 U.S. 811, 823, 117 S. Ct. 2312, 2319 (1997)).

The Property Owners submit that there is a jurisdictional fact issue as to how the other commissioners would have voted if Commissioner Klement's vote were excluded. As support, they cite *City of Leon Valley v. Wm. Rancher Estates Joint Venture*, No. 04-14-00542-CV, 2015 WL 2405475, at *6 (Tex. App.—San Antonio May 20,

16

2015, no pet.) (mem. op.). The Property Owners' reliance on *City of Leon Valley* is misplaced. There, a city councilmember did not disclose her conflict of interest prior to a vote on a zoning request, and the plaintiffs submitted affidavits from two other councilmembers attesting that if conflict had been disclosed, their votes on the request would have changed. *Id.* There was also evidence that the overall outcome of the vote would have been different. *Id.* Here, by contrast, the meeting minutes reflect that Commissioner Klement did disclose his conflict immediately before the commissioners voted on the resolution when he fielded public comments and openly discussed the conflict's effect on his ability to vote. Despite Commissioner Klement's disclosure, the other commissioners nonetheless voted to designate the reinvestment zone. Also unlike *City of Leon Valley*, the Property Owners have offered nothing to show that further action to address the conflict (more thorough or formal disclosure, perhaps) would have changed any votes besides Commissioner Klement's. Thus, because it appears that accounting for Commissioner Klement's conflict would not have altered the outcome of the vote, the first link in the Property Owners' causative chain is flawed.

The next link in the chain is an uncontroversial statutory reality: that without the reinvestment zone, there will be no tax abatement agreement. *See* Tex. Tax Code Ann. § 312.402(a) (providing authority to enter a tax abatement agreement with the owner of property located "in a reinvestment zone").

17

But the third link—that without a tax abatement Wildcat will not build a wind farm—is faulty as well, or at least underdeveloped.  The Property Owners have not directed our attention to any allegation or evidence that without a tax abatement, Wildcat would not build a wind farm.  Indeed, in Wildcat's independent judgment, it may still conclude that building the wind farm makes financial sense even without an abatement.  Special problems arise when, as here, the plaintiff's theory of standing "depends on the unfettered choices made by independent actors . . . whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Lujan*, 504 U.S. at 562, 112 S. Ct. at 2137 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615, 109 S. Ct. 2037, 2044 (1989)).  In those circumstances, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce" a traceable line between the choices and the challenged government action.  *Id.*, 112 S. Ct. at 2137.  The Property Owners have not offered any indication as to what financial choices face Wildcat or its parent company EDP with regard to the wind farm, much less anything establishing that precluding a tax abatement would doom the project.[5]

---

[5]While unmentioned by the Property Owners, our review of the record reveals that in Wildcat's application to another taxing entity, it stated that the wind farm project will not be "competitive" without "abatement agreements" from other "respective entities."  We do not view this brief reference to competitiveness as sufficient to demonstrate the required traceability between the reinvestment zone and the Property Owners' property values.

What this case lacks in terms of causation is well illustrated by *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72–78, 98 S. Ct. 2620, 2630–33 (1978). There, as here, a utility company proposed to build power plants, and it was sued by "individuals who live within close proximity to the planned facilities." *Id.* at 67, 98 S. Ct. at 2627. The property owners challenged the construction of the nuclear plants by attacking the validity of legislation that financially favored the utility companies by capping their maximum liability in case of a nuclear accident. *Id.* at 65–67, 98 S. Ct. at 2626–27. For purposes of standing, the Court upheld the district court's finding that the plants' likely environmental and radiation effects were sufficiently particularized. *Id.* at 73–74, 98 S. Ct. at 2630–31. As to causation, the Court accepted the view that without the benefit of the liability cap, the power companies would not proceed with construction of the power plants. *Id.* at 74–77, 98 S. Ct. at 2631–32. But critically, the Court based this conclusion on an allegation and a four-day hearing's worth of evidence that the utility probably would not complete construction of the plants if the liability cap were declared invalid. *Id.* at 75–77, 98 S. Ct. at 2631–32. This evidence included the receipt of past testimony before Congress by nuclear industry spokesmen, who indicated that loss of the liability cap's protection might cause power companies to exit the industry, as well as live testimony from the defendant utility's vice president, who echoed the views held by the industry's architects, engineers, and smaller producers of component parts: they considered the

19

continuation of the cap to be a "critical variable in determining their continued involvement with nuclear power." *See id.* at 75–77, 98 S. Ct. at 2631–32.

Unlike *Duke Power*, the Property Owners have offered nothing to connect the supposedly invalid government benefit—enactment of a reinvestment zone—to a third party's decision whether to build a power plant that will ostensibly lead to their injury—diminished property values. In *Duke Power*, that connection was alleged and thoroughly proved. In this case, it remains an unknown.[6] *Cf. Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 1164 (1997) (explaining that traceability may be established when the injury is produced through the governmental action's "determinative or coercive effect upon the action of someone else"). Because the Property Owners have failed to establish the traceability component of standing, they have not carried their initial burden to affirmatively demonstrate the trial court's jurisdiction. *See Heckman*, 369 S.W.3d at 150.

The Property Owners have not carried their burden to establish standing and ripeness, and we therefore sustain the County Defendants' first issue on cross-appeal. If the plaintiffs lack standing to bring their claims, the court must dismiss the whole action for want of jurisdiction. *Id.* at 150–51. A lack of ripeness requires a similar result. *See Perry*, 66 S.W.3d at 251. We therefore vacate the trial court's judgment and dismiss the case. *See* Tex. R. App. P. 43.2(e).

---

[6]Moreover, *Duke Power* has itself been described as a "remarkable" application of "the causation dimension of standing" that stretches the doctrine to its limits. Charles A. Wright et al., 13A Federal Practice & Procedure § 3531.5 (3d ed.).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  March 25, 2021